Lois **ROBINSON**, Plaintiff,

v.

**JACKSONVILLE SHIPYARDS, INC., et al., Defendants.**

**No. 86–927–Civ–J–12.**

United States District Court,
M.D. Florida,
Jacksonville Division.

Jan. 18, 1991.

Order, Injunction and Final Judgment
March 8, 1991.

See also 118 F.R.D. 525.

Kathy G. Chinoy, Jacksonville, Fla., Alison Wetherfield and Sarah E. Burns, NOW Legal Defense & Educ. Fund, New York City, for plaintiff.

Eric J. Holshouser and William H. Andrews, Coffman, Coleman, Andrews & Grogan, Jacksonville, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MELTON, District Judge.

This action was commenced by plaintiff Lois Robinson pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and Executive Order No. 11246, as amended. Plaintiff asserts defendants created and encouraged a sexually hostile, intimidating work environment. Her claim centers around the presence in the workplace of pictures of women in various stages of undress and in sexually suggestive or submissive poses, as well as remarks by male employees and supervisors which demean women. Defendants dispute plaintiff's description of the work environment and maintain that, to the extent the work environment may be found to satisfy the legal definition of a hostile work environment, they are not liable for the acts that give rise to such a description. Defendants further contest the Court's authority to structure a remedy in the form sought by plaintiff.

This non-jury action was tried by the Court over the course of eight days in January and February 1989, with final arguments subsequently submitted in writing. Testimony was received from various persons who were involved in the events allegedly creating the hostile work environment. The testimony of several witnesses was received in deposition form.[1] Each

---

1. Six witnesses were unavailable and testified by deposition: Arnold McIlwain, Lawrence Brown, Quentin McMillan, Steven Leach, Harry Wingate, and Rose Sanders. Additionally, deposition testimony was received for several wit-

side presented two expert witnesses. Photographs and other documentary evidence were received. The Court has fully considered the believability of the testimony presented, including the credibility of witnesses, and has also carefully reviewed the photographs and other documentary evidence. Based thereon, the Court finds that certain of the defendants violated Title VII through the maintenance of a sexually hostile work environment and thereby discriminated against plaintiff because of her sex. In so holding, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).[2] To the extent that any Findings of Fact constitute Conclusions of Law, they are adopted as such; to the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

## FINDINGS OF FACT

### Parties

1. Plaintiff Lois Robinson ("Robinson") is a female employee of Jacksonville Shipyards, Inc. ("JSI"). She has been a welder since September 1977. Robinson is one of a very small number of female skilled craftworkers employed by JSI. Between 1977 and the present, Robinson was promoted from third-class welder to second-class welder and from second-class welder to her present position as a first-class welder.

2. JSI is a Florida corporation that runs several shipyards engaged in the business of ship repair, including the Commercial Yard and the Mayport Yard. (The Court takes judicial notice of the closing and the reopening of the Commercial Yard operation subsequent to the trial of this case.) JSI does ship repair work for the federal government Department of the Navy. *See* P.Exh. No. 73 (list of Navy vessels JSI worked on during 1983–88). As a federal contractor, JSI has affirmative action and non-discrimination obligations. 6 T.T. at 80–81 (stipulation by counsel); P.Exh. No. 34.

3. Defendant Arnold McIlwain ("McIlwain") held the office of President of JSI from the time Robinson was hired by the company through the time of the trial of this case. (The Court is aware from news reports that McIlwain no longer holds this office.) In that capacity he was the highest-ranking officer at JSI; as such he had supervisory authority over Robinson throughout her employment at JSI.

4. Defendant Lawrence Brown ("Brown") has been Vice–President for Operations at JSI since 1980. During the time relevant to this case, he oversaw the operations of the Commercial Yard and the Mayport Yard and formulated policies and regulations concerning the conduct and treatment of JSI employees at these two yards. He had and has supervisory authority over Robinson.

---

nesses who testified: John Stewart, Ellis Lovett, Everette Owens, Elmer Ahlwardt, John Kiedrowski, Fred Turner, Leslie Albert, and Lawanna Gail Banks. The parties designated portions of these depositions and the parties' lists of designations were filed as exhibits. In several instances the deposition accompanied the exhibit and in several instances the deposition had been filed with the Court previously. For simplicity, the Court will cite to the deposition excerpts, when appropriate, in the form "[deponent's last name] Depo. at [page number(s)]."

2. The Court directly incorporates into its findings those matters admitted by the defendants in their responses to plaintiff's requests for admissions, which appear in P.Exh. No. 9, and those matters stipulated to in the Amended Pretrial Stipulation, filed herein on October 30, 1988. No supporting citation is given for factual statements drawn from these two sources. *See Monmouth County Corr. Inst. Inmates v.*

*Lanzaro,* 595 F.Supp. 1417, 1432 (D.N.J.1984). To the extent that any evidence presented at trial varied from these admissions, the Court must treat the matters admitted as conclusively established, *e.g., Haun v. Humana, Inc.,* 651 F.Supp. 120, 122 (W.D.Ky.1986), and must refuse to consider the inconsistent evidence, *see, e.g., Shakman v. Democratic Org. of Cook County,* 481 F.Supp. 1315, 1316 n. 35 (N.D.Ill.1979). Defendants did not move to amend or vacate their admissions, so the Court has not evaluated whether the standards applicable to such a motion could be met. *See, e.g., Brook Village N. Assocs. v. General Elec. Co.,* 686 F.2d 66, 70–73 (1st Cir.1982) (setting forth standards for pretrial and trial motions for amending admissions); *see also Smith v. First National Bank of Atlanta,* 837 F.2d 1575, 1577–78 (11th Cir.) (adopting central premise of *Brook Village* ), *cert. denied,* 488 U.S. 821, 109 S.Ct. 64, 102 L.Ed.2d 41 (1988).

5. Defendant John Stewart ("Stewart") has been Industrial Relations Manager of JSI since 1981. During the time relevant to this case, he was responsible for personnel policies at all of JSI's facilities, including the Mayport Yard and the Commercial Yard, and was in charge of handling Equal Employment Opportunity (EEO) complaints filed against JSI.

6. Defendant Elmer L. Ahlwardt ("Ahlwardt") was Vice–President of the Mayport Yard from 1977 to 1988. During that time, he was the highest ranking official and principal supervisor at the Mayport Yard. (He retired from JSI in 1988.) He had supervisory authority over Robinson throughout her employment by JSI when she worked at the Mayport Yard.

7. Defendant Everette P. Owens ("Owens") was a yard superintendent at the Mayport Yard from 1973 until 1988. (He was not working at the time of the trial due to an injury.) He was responsible for managing the daily operation of the Mayport Yard; he had supervisory authority over Robinson when she worked there.

8. Defendant Ellis Lovett ("Lovett") has been shipfitters' foreman at JSI's Mayport Yard since approximately 1970. Lovett handled personnel problems in his shop, including reprimanding shipfitters at the Mayport Yard.

9. Defendant John Kiedrowski ("Kiedrowski") was promoted from first-class welder to leaderman at JSI in 1976, and since that time he has held the position of either quarterman or leaderman. Kiedrowski has exercised limited supervisory authority over Robinson and has inspected her work. Kiedrowski Depo. at 42. In January 1985 Kiedrowski was the most senior person in the welding department on the day shift at the Mayport Yard and aboard the *U.S.S. Saratoga.* 8 T.T. at 97.

### The JSI Workplace

10. In addition to a welding department, JSI's other craft departments include shipfitting, sheetmetal, electrical, transportation, shipping and receiving (including toolroom), carpenter, boilermaker, inside machine, outside machine, rigging, quality assurance and pipe. Employees in these craft departments may be assigned to work at either the Mayport Yard, situated at the Mayport Naval Station, or the Commercial Yard, situated at a riverfront site in downtown Jacksonville and sometimes referred to as the downtown yard. Robinson's job assignments at JSI have required her to work at both the Commercial Yard and the Mayport Yard.

11. The term "shop" has two meanings at the shipyards. The various craft departments are called shops. These departments also have permanent physical locations that are called shops. A craft department may bear a nickname; for example, the shipfitters' shop is sometimes referred to as the fab shop.

12. At Mayport, the shops are housed in several large buildings in the "backyard compound." When an aircraft carrier is docked for repair, the ship gives a compound to JSI in a hangar bay in which to put trailers which serve as temporary offices for each shop or department. This shipboard compound may range from approximately 30 feet by 100 feet to 60 feet by 150 feet. The space between the trailers on either side of the compound is approximately wide enough to allow passage of a truck. Each trailer houses two temporary offices, about six feet by twelve feet in size, which may be empty, or may contain office furniture (for example, desks and bulletin boards). Workers store their equipment in the trailers and congregate there with coworkers, both to socialize and for work-related reasons.

13. Robinson's job assignments at the Mayport Yard have included "combination jobs," in which she sometimes works as a welder in combination with shipfitters. At times, Robinson has been directed by her superiors to stand in front of the shipfitters' trailer to get her assignment from the shipfitters' leaderman. When welders work with shipfitters at the Mayport Yard, it is not unusual for them to go into the shipfitters' trailer. Robinson has, for example, gone into the shipfitters' trailer to check on paperwork or her assignment.

14. Ship repair work is a dangerous profession; JSI acknowledges the need to "provide a working environment that is

safe and healthful." Jt.Exh. No. 11, at 37 (collective bargaining agreement); *see also* Jt.Exh. No. 12 (JSI Safety Instructions and General Company Rules). Accidents pose a continuing risk and do happen; as defendant McIlwain noted, where individuals are working together, "one slip" could lead to someone getting hurt. McIlwain Depo. at 27. Welding, Robinson's profession, poses particular risks. *See* Turner Depo. at 62–65 (falling, slipping, burns, flammable gas).

15. Quartermen and leadermen at JSI are union bargaining unit employees who assign and check the work performed by craftworkers. Quartermen are below foremen in authority, but a quarterman does the foreman's job when the foreman is absent from the work area. Owens Depo. at 33–34. Leadermen are directly below quartermen in authority and look to quartermen as their immediate supervisors. 5 T.T. at 172. Leadermen often are the most senior persons in a shop in a work area. *See, e.g.,* 7 T.T. at 128; 8 T.T. at 97. Leadermen, however, lack the authority to hire, fire, or promote other employees. 8 T.T. at 89. Leadermen cannot discipline other workers, *id.,* although they can make recommendations to the foremen about discipline, McMillan Depo. at 137. Leadermen have no authority to resolve or adjust formal employee grievances. 8 T.T. at 89.

### The JSI Working Environment

16. JSI is, in the words of its employees, "a boys club," 4 T.T. at 36, and "more or less a man's world," McMillan Depo. at 97. Women craftworkers are an extreme rarity. The company's EEO–1 reports from 1980 to 1987 typically show that women form less than 5 percent of the skilled crafts. P.Exh. Nos. 35–42. For example, JSI reported employing 2 women and 958 men as skilled craftworkers in 1980, 7 women and 1,010 men as skilled craftworkers in 1983, and 6 women and 846 men as skilled craftworkers in 1986. Henry Starling, a shift superintendent at the Commercial Yard, testified that on a busy shift he may see only 8 or 10 women, while seeing 150 men; on a quiet shift he may see no women at all. 7 T.T. at 21–22; *see also* 5 T.T. at 169 (welding leaderman estimated shift of 50 to 100 people included only 1 or 2 women); Lovett Depo. at 8 (only 5 or 6 of 98 shipfitters are female); Turner Depo. at 6 (only 2 of approximately 100 welders are female). Leslie Albert, Lawanna Gail Banks, and Robinson each testified that she was the only woman in a crowd of men on occasions when each was sexually harassed at JSI. *See, e.g.,* 1 T.T. at 32–33, 112–14, 175–76; 2 T.T. at 16, 35–37; 3 T.T. at 42–47, 52–54, 84–86, 109–11; 4 T.T. at 11–12, 25–28, 75–77. JSI has never employed a woman as a leaderman, quarterman, assistant foreman, foreman, superintendent, or coordinator. Nor has any woman ever held a position of Vice–President or President of JSI.

17. Pictures of nude and partially nude women appear throughout the JSI workplace in the form of magazines, plaques on the wall, photographs torn from magazines and affixed to the wall or attached to calendars supplied by advertising tool supply companies ("vendors' advertising calendars"). Two plaques consisting of pictures of naked women, affixed to wood and varnished, were introduced into evidence, Jt. Exh. Nos. 6, 7, and identified by several witnesses as having been on display for years at JSI in the fab shop area under the supervision of defendant Lovett, 1 T.T. at 101; 7 T.T. at 94; 8 T.T. at 142–43.

18. Advertising calendars, such as Joint Exhibits Nos. 1–5, have been delivered for years to JSI by vendors with whom it does business. JSI officials then distribute the advertising calendars among JSI employees with the full knowledge and approval of JSI management. JSI employees are free to post these advertising calendars in the workplace. (It is not a condition of JSI's contracts with the vendors that the advertising calendars be posted.) A major supplier of advertising calendars to JSI is Whilden Valve and Gauge Repair, Inc.; Valve Repair, Inc. also does business with JSI and also delivers advertising calendars to the company. Joint Exhibit No. 1 is the 1984 Whilden Valve and Gauge Repair, Inc. calendar that was distributed among employees at JSI; it hung in the pipe shop at the Mayport Yard, among other places. The exhibit designated as Joint Exhibit No. 2 is a copy of an advertising calendar from Whilden Valve and Gauge Repair, Inc. that

was posted, among other places, in the shipfitters' temporary office on the *U.S.S. Saratoga* in January 1985. Joint Exhibit No. 5 is a copy of a Valve Repair, Inc. calendar that was distributed at JSI in 1987 and which was on display in, among other places, the offices of the foreman and leaderman of the pipe shop at the Commercial Yard. Generally speaking, these calendars feature women in various stages of undress and in sexually suggestive or submissive poses. A description in greater detail of the calendars' contents is set forth in Findings of Fact ("FOF") ¶ 25. Several male JSI employees corroborated the display of similar advertising calendars at JSI. *See, e.g.,* 6 T.T. at 130, 145 (Owens); *id.* at 198–200 (Ahlwardt); 7 T.T. at 53 (McBride); *id.* at 79, 93 (Cooney).

19. JSI has never distributed nor tolerated the distribution of a calendar or calendars with pictures of nude or partially nude men. Ahlwardt stated that he has never seen a picture of a nude man at JSI and would be surprised to see one. Ahlwardt Depo. at 100–01. Lovett said that he would probably throw such a calendar in the trash. Lovett Depo. at 18–20. Welding foreman Fred Turner noted it was accepted at the shipyards for vendors to supply calendars of nude women, but he had never known of a vendor distributing a calendar of nude men and, if one did so, he would think the "son of a bitch" was "queer." Turner Depo. at 52–53.

20. JSI employees are encouraged to request permission to post most kinds of materials; however, prior approval by the company is not required for the posting of advertising calendars with pictures of nude or partially nude women. JSI management has denied employees' requests to post political materials, advertisements and commercial materials.

21. Bringing magazines and newspapers on the job is prohibited, 6 T.T. at 139–42, but male JSI employees read pornographic magazines in the workplace without apparent sanctions, *see* 7 T.T. at 215–23 (testimony of Roy Wingate regarding Robinson's complaint about coworker reading pornographic magazine on the job). Although JSI employees are discouraged by management from reading on the job,

they are not prohibited from tearing sexually suggestive or explicit pictures of women out of such magazines and displaying them on the workplace walls at JSI. Kiedrowski Depo. at 76–77; *see also* Leach Depo. at 19–21, 26 (*Playboy* and *Penthouse* magazines in desk drawers in shipfitting shop and trailer office; Leach showed them to other men in the fab shop); McMillan Depo. at 46–47 (magazines showing nude women kept in storeroom and transportation department for JSI male employees to read).

22. Management employees from the very top down condoned these displays; often they had their own pictures. McIlwain, for example, has been aware for years of *Playboy*- and *Penthouse*-style pictures showing nude women posted in the workplace; he refused to issue a policy prohibiting the display of such pictures. McIlwain Depo. at 56–57, 81–82. Both Brown and Stewart have encountered pictures of nude or partially nude women in the work environment at JSI. Nevertheless, both men have concluded, and agreed with each other, that there is nothing wrong with pictures of naked or partially naked women being posted in the JSI workplace. Ahlwardt kept a "pin-up" himself, 6 T.T. at 207; Lovett, like some other foremen, had vendors' advertising calendars in his office. Lovett Depo. at 35–36; Jt.Exh. No. 5. Coordinators, who are members of management, 6 T.T. at 132, and who are responsible for ensuring that government contracts are performed to the satisfaction of the federal government, have had pornographic magazines in the desks of their trailers, 5 T.T. at 182.

*Sexual Harassment of Plaintiff*

23. Robinson credibly testified to the extensive, pervasive posting of pictures depicting nude women, partially nude women, or sexual conduct and to the occurrence of other forms of harassing behavior perpetrated by her male coworkers and supervisors. Her testimony covered the full term of her employment, from 1977 to 1988. The Court considered those incidents that fall outside the time frame of a Title VII complaint for the purpose of determining

the context of the incidents which are actionable (i.e., whether the more recent conduct may be dismissed as an aberration or must be considered to be a part of the work environment) and for the purpose of assessing the reasonableness of the response by defendants to the complaints that Robinson made during the Title VII time frame. The Court also recognizes some limitations in Robinson's testimony. She tried to ignore some sexual comments. Her testimony included many episodes of harassment not previously disclosed in her answers to defendants' interrogatories because, as stated in those answers, the frequency with which the incidents occurred over the course of her employment made delineating every one a difficult task. Robinson's demeanor at trial reflected the emotional nature of her recollections. Moreover, the large number of male employees and the often surreptitious nature of the postings and graffiti writings left Robinson incapable of identifying many of her harassers. (Indeed, a perusal of her testimony and that of her coworkers reveals that many persons in the shipyards knew each other only by nicknames.) These limitations, however, do not diminish the weight and the usefulness of the testimony. The individual episodes illustrate and lend credibility to the broader assertion of pervasiveness.

24. Robinson's testimony provides a vivid description of a visual assault on the sensibilities of female workers at JSI that did not relent during working hours. She credibly testified that the pervasiveness of the pictures left her unable to recount every example, but those pictures which she did describe illustrate the extent of this aspect of the work environment at JSI. She testified to seeing in the period prior to April 4, 1984, the three hundredth day prior to the filing of her EEOC charge:

(a) a picture of a woman, breasts and pubic area exposed, inside a drydock area in 1977 or 1978. 1 T.T. at 104.

(b) a picture of a nude Black woman, pubic area exposed to reveal her labia, seen in the public locker room. 1 T.T. at 105.

(c) drawings and graffiti on the walls, including a drawing depicting a frontal view of a nude female torso with the words "USDA Choice" written on it, at the Commercial Yard in the late 1970's or early 1980's, in an area where Robinson was assigned to work. 1 T.T. at 112–13.

(d) a picture of a woman's pubic area with a meat spatula pressed on it, observed on a wall next to the sheetmetal shop at Mayport in the late 1970's. 1 T.T. at 113.

(e) centerfold-style pictures in the Mayport Yard toolroom trailer, which Robinson saw daily in the necessary course of her work for over one month in the late 1970s. 1 T.T. at 105–08. Neal McCormick, a toolroom worker from 1975 to 1980, verified that the toolroom personnel had indeed displayed pictures of nude women "of the Playboy centerfold variety" during the time he worked there. 8 T.T. at 66–67.

(f) pictures of nude or partially nude women in the fab shop lockers at the Commercial Yard in 1978 through 1980. 1 T.T. at 110–11.

(g) a pornographic magazine handed to Robinson by a male coworker in front of other coworkers in the early 1980s. 1 T.T. at 110–11.

(h) a magazine containing pictures of nude and partially nude women in the possession of a pipefitter, in 1980, who was reading it in the engine room of a ship. 2 T.T. at 17.

(i) pictures in the shipfitters' shop at the Commercial Yard, in 1983, observed by Robinson while she was walking to the welding shop, including a frontal nude with a shaved pubic area and corseted nude with her breasts and buttocks area exposed. 1 T.T. at 120–21. Robinson complained to John Robinson, the quarterman on the third shift in the shipfitting department, about the second picture; he took it down that night and she never saw the picture again. *Id.*

(j) a picture of a woman with her breasts exposed, on the outside of a shack on a ship in the Commercial Yard. 2 T.T.

at 10. Robinson enlisted the assistance of union vice-president Leroy Yeomans to have the picture removed. 6 T.T. at 221–22, 228–29. It was removed within a day or two.

25. Robinson's testimony concerning visual harassment in the period commencing April 4, 1984, includes:

(a) a picture of a nude woman with long blonde hair wearing high heels and holding a whip, waved around by a coworker, Freddie Dixon, in 1984, in an enclosed area where Robinson and approximately six men were working. 1 T.T. at 114–20. Robinson testified she felt particularly targeted by this action because she has long blonde hair and works with a welding tool known as a whip. *Id.* at 114. Dixon admitted that he had indeed waved the picture around for other male employees to see, but denied that he intended to target or offend Robinson. 7 T.T. at 150. In fact, Dixon claimed that he was unaware that Robinson was in the area and that he was unaware that Robinson was a blonde. *Id.* at 149–51. The Court does not find his denials credible; the evidence more readily supports the conclusion that Dixon intended to offend Robinson, or acted with such disregard for her that the harassment could be equated with intent.

(b) calendars posted in the pipe shop in the Commercial Yard, in 1983 or 1984, including a picture in which a nude woman was bending over with her buttocks and genitals exposed to view. 1 T.T. at 121–22. (Joint Exh. No. 1 was admitted as illustrative of this type of calendar. It is a Whilden Valve and Gauge calendar for 1984. The naked breasts or buttocks of each model are exposed in every month; the pubic areas also are visible on the models featured in April and September. Several of the pictures are suggestive of sexually submissive behavior.) Robinson testified that she observed at least three pictures posted in the pipe shop. *Id.* Although this was not Robinson's usual work area, she was in that shop

with a leaderman to find the pipe shop leaderman to clarify a work matter. *Id.* at 122.

(c) a picture of a nude woman with long blond hair sitting in front of a mirror brushing her hair, in a storage area on a ship. 1 T.T. at 123. Robinson mentioned to either a leaderman or the assistant foreman that she considered it a "very dirty ship," and she was subsequently reassigned to a different location. *Id.*

(d) Joint Exh. No. 3, a Whilden Valve & Gauge calendar for 1985, which features *Playboy* playmate of the month pictures on each page. 2 T.T. at 21. The female models in this calendar are fully or partially nude. In every month except February, April, and November, the model's breasts are fully exposed. The pubic areas are exposed on the women featured in August and December. Several of the pictures are suggestive of sexually submissive behavior.

(e) several pictures of nude or partially nude women posted in the fab shop area in the backyard of the Mayport Yard, in January 1985, visible to her from her path to and from the time clock building. 1 T.T. at 19–20.

(f) pictures in the shipfitters' trailer on board the *U.S.S. Saratoga,* in January 1985, including one picture of two nude women apparently engaged in lesbian sex. 1 T.T. at 22–23. Robinson later observed a calendar, Jt. Exh. No. 2, in this office. *Id.* at 44–45. This calendar, distributed by Whilden Valve and Gauge, features pictures of nude and partially nude women each month. The breasts of each model are exposed; the pubic areas of the models also are exposed for May, October and December. Several of the pictures are suggestive of sexually submissive behavior.

(g) pictures in the toolroom trailer aboard the *U.S.S. Saratoga,* in January 1985, including one of a nude woman with long blond hair lying down propped up on her elbow and a

smaller black and white photograph of a female nude. 1 T.T. at 24–25. These pictures formed a part of Robinson's complaint that forms the foundation of this lawsuit. The details are recounted *infra* FOF ¶¶ 98–116.

(h) pictures in the fab shop area, in January 1985, including one of a woman wearing black tights, the top pulled down to expose her breasts to view, and one of a nude woman in an outdoor setting apparently playing with a piece of cloth between her legs. 1 T.T. at 55–56.

(i) Joint Exh. No. 4, a Whilden Valve & Gauge calendar for 1986, which features *Playboy* playmate of the month pictures on each page. 1 T.T. at 103–04. The female models in this calendar are fully or partially nude. In every month except April, the model's breasts are fully exposed. The pubic areas are exposed on the women featured in May, June and December. Several of the pictures are suggestive of sexually submissive behavior.

(j) a picture of a nude woman left on the tool box where Robinson returned her tools, in the summer of 1986. 2 T.T. at 35. The photograph depicted the woman's legs spread apart, knees bent up toward her chest, exposing her breasts and genitals. *Id.* at 36. Several men were present and laughed at Robinson when she appeared upset by the picture. *Id.* at 36–37.

(k) pictures seen in the shipfitters' trailer, in 1986, including one of a woman with short blond hair, wearing a dark vest pulled back to expose her breasts. 1 T.T. at 192. Robinson complained to shipfitter leaderman Danny Miracle about the photograph of the blond woman. Miracle removed the photograph, with some reluctance, but it was posted again shortly thereafter. 8 T.T. at 70–71. It was not visible from outside the trailer when it was posted the second time. *Id.*

(*l*) a sexually-oriented cartoon, D.Exh. No. 1, posted in the safety office, in 1986, at the Mayport Yard. 1 T.T. at 193–96.

(m) pictures observed in the fab shop area office, in 1986, including Jt.Exh. No. 6, 1 T.T. at 101, and a picture of a topless brown haired woman. 2 T.T. at 5–7. Joint Exh. No. 6 is a wooden plaque consisting of a picture of a very young-looking woman with one breast fully exposed and the other breast partially exposed. Robinson also remarked that another plaque was present in that shop, without further identifying it. Other testimony indicated that Jt.Exh. No. 7 hung in the fab shop at that time. Jt.Exh. No. 7 shows a nude woman straddling a hammock with her head tossed back and her back arched. Her exposed breasts are fully visible as is some pubic hair.

(n) a life-size drawing of a nude woman on a divider in the sheetmetal shop, in April 1987, which remained on the walls for several weeks. 1 T.T. at 169–70.

(*o*) a drawing on a heater control box, approximately one foot square, of a nude woman with fluid coming from her genital area, in 1987, at the Commercial Yard. 1 T.T. at 170–72.

(p) Joint Exh. No. 5, a Valve Repair, Inc. calendar for 1987, which features *Playboy* playmate of the month pictures on each page. 1 T.T. at 172–73. (Defendants have admitted that this calendar was displayed during 1987 in the foreman's and leaderman's offices of the pipe shop at the Commercial Yard.) The female models in this calendar are fully or partially nude. In every month the model's breasts are fully exposed. The pubic areas are exposed on the women featured in March and September. Several of the pictures are suggestive of sexually submissive behavior.

(q) a dart board with a drawing of a woman's breast with her nipple as the bull's eye, in 1987 or 1988, at the Commercial Yard. 1 T.T. at 175–76.

(r) pornographic magazines, including *Players*, on a table by the gangway of a ship, in 1987 or 1988, where JSI machinists were looking through them and commenting on the pictures, 1 T.T. at 180–82, a *Club* magazine, held out by coworker Thomas Adams in the bow of a ship, *id.* at 183–84, several magazines being read by pipefitters, in 1986, aboard a ship at the Mayport Yard, 2 T.T. at 16, and various other instances of welders with magazines throughout the 1980's, *id.* at 18.

(s) pictures of nude and partially nude women posted in the engine room of the *M/V Splay*, in 1988, at the Commercial Yard, including a picture of a nude woman in a kneeling position and a calendar featuring photographs of nude women. 1 T.T. at 177–79. Robinson complained to her leaderman, who in turn found a person associated with the ship to remove and cover the pictures. *Id.* at 179. Later, however, the pictures were again posted and uncovered. *Id.* at 179–80.

(t) a shirt worn by the shop steward, in December 1988, with a drawing of bare female breasts and the words "DALLAS WHOREHOUSE" written on it. 2 T.T. at 204–05.

26. In January 1985, following a complaint by Robinson concerning a calendar in the shipfitters' trailer, the words "Men Only" were painted on the door to that trailer. Full details of this incident are recounted *infra* FOF ¶¶ 102–106.

27. Robinson also testified about comments of a sexual nature she recalled hearing at JSI from coworkers. In some instances these comments were made while she also was in the presence of the pictures of nude or partially nude women. Among the remarks Robinson recalled are: "Hey pussycat, come here and give me a whiff," 1 T.T. at 54–55; "The more you lick it, the harder it gets," *id.* at 96 (incorrectly transcribed as "The more you look at it . . ."); "I'd like to get in bed with that," *id.* at 175; "I'd like to have some of that," *id.*; "Black women taste like sardines," *id.* at 129; "It doesn't hurt women to have sex right after childbirth," *id.*; "That one there is mine" (referring to a picture in a magazine), *id.* at 181; "Watch out for Chet. He's Chester the Molester" (referring to a cartoon character in a pornographic magazine who molests little girls), 2 T.T. at 17; "You rate about an 8 or a 9 on a scale of 10," *id.* at 18. She recalled one occasion on which a welder told her he wished her shirt would blow over her head so he could look, 1 T.T. at 126, another occasion on which a fitter told her he wished her shirt was tighter (because he thought it would be sexier), *id.* at 127–28, an occasion on which a foreman candidate asked her to "come sit" on his lap, *id.* at 130, and innumerable occasions on which a coworker or supervisor called her "honey," "dear," "baby," "sugar," "sugar-booger," and "momma" instead of calling her by her name, *id.* at 57, 128, 173–74. Robinson additionally related her exposure to joking comments by male coworkers about a woman pipefitter whose initials are "V.D." 2 T.T. at 17–18.

28. Robinson encountered particularly severe verbal harassment from a shipfitter, George Nelson ("Nelson"), while assigned to work with him on a number of different nights in 1986 at the Mayport Yard. Nelson regularly expressed his displeasure at working with Robinson, making such remarks as "women are only fit company for something that howls," and "there's nothing worse than having to work around women." 1 T.T. at 196–201. On one occasion, Nelson responded to Robinson's inquiry regarding a work assignment by stating, "I don't know, I don't care where you go. You can go flash the sailors if you want." *Id.* at 196–97. On other occasions, Nelson ridiculed Robinson in front of the Navy fire watch personnel. *Id.* at 197–98. When Robinson confronted Nelson over her perception of his behavior as sexual harassment, Nelson denied he was engaging in harassment because he had not propositioned her for sexual favors. *Id.* at 200. Nelson subsequently made Robinson's perception of "harassment" a new subject of ridicule and accused her of "crusading on a rabbit." 2 T.T. at 5.

29. On one occasion, George Leach told an offensive joke in Robinson's presence, the subject matter of which concerned

"boola-boola," a reference to sodomous rape. 1 T.T. at 131–35. He admitted telling the joke but maintained that he told it quietly and Robinson had taken steps to avoid hearing the joke. The Court credits Robinson's testimony and further observes that the work environment is not rendered less hostile by a male coworker's demand of a female worker that she "take cover" so that the men can exchange dirty jokes. Leach later teased Robinson in a threatening fashion by yelling "boola-boola" at her in the parking lot at JSI. Robinson subsequently learned that some shipfitters had dubbed her "boola-boola" as a nickname arising out of these events. *Id.* at 133.

30. Robinson testified concerning the presence of abusive language written on the walls in her working areas in 1987 and 1988. Among this graffiti were the phrases "lick me you whore dog bitch," "eat me," and "pussy." This first phrase appeared on the wall over a spot where Robinson had left her jacket. 1 T.T. at 163–65. The second phrase was freshly painted in Robinson's work area when she observed it. *Id.* at 165–67. The third phrase appeared during a break after she left her work area to get a drink of water. *Id.* at 167–68.

31. Donald Furr, Robinson's leaderman, attested to further evidence of the frequency with which this abusive graffiti occurred. He stated that he had seen words like "pussy" and "cunt" written on the walls in the JSI workplace. 5 T.T. at 165–67. He added that at one point "it was getting to be an almost every night occasion [Robinson] wanted something scribbled out or a picture tooken [sic] down...." *Id.* at 171.

### Sexual Harassment of Other Female Craftworkers

32. The Court heard testimony from two of Robinson's female coworkers, Lawanna Gail Banks ("Banks") and Leslie Albert ("Albert"), concerning incidents of sexual harassment to which they were subjected, including incidents that did not occur in Robinson's presence. The Court heard this evidence for several reasons. First, as with the incidents outside the time frame of a Title VII complaint involving Robinson, incidents involving other female employees place the conduct at issue in context. The pervasiveness of conduct constituting sexual harassment outside Robinson's presence works to rebut the assertion that the conduct of which Robinson complains is isolated or rare. Second, the issue in this case is the nature of the work environment. This environment is shaped by more than the face-to-face encounters between Robinson and male coworkers and supervisors. The perception that the work environment is hostile can be influenced by the treatment of other persons of a plaintiff's protected class, even if that treatment is learned second-hand. Last, other incidents of sexual harassment are directly relevant to an employer's liability for the acts of employees and to the issue of an appropriate remedy for the sexual harassment perpetrated against Robinson.

33. Banks and Albert both confirmed the description of the work environment related by Robinson. Each of these other women endured many incidents of sexually harassing behavior. To the extent that defendants attempted to show that either Banks or Albert engaged in behavior demonstrating a welcomeness of the sexually harassing behavior or a lack of offense at such behavior, the Court does not find these contentions credible. Rather, for reasons expressed in the expert testimony *infra*, the Court finds the description of these witnesses' behavior to be consistent with the coping strategies employed by women who are victims of a sexually hostile work environment.

34. Banks testified that she experienced what she considers to be sexual harassment in the form of comments, pictures, public humiliation and touching by male coworkers and supervisors. 3 T.T. at 30–31. The harassing behavior negatively affected her attitude toward work; she had to prepare herself mentally each day for what might happen. *Id.* at 131–32. Among the incidents to which she credibly testified:

(a) being pinched on the breasts by a foreman, *id.* at 34–35.

(b) having her ankles grabbed by a male coworker who pulled her legs apart and stood between them, *id.* at 36–37.

(c) hearing such comments as "it's a cunt hair off," *id.* at 38, "are you on the rag," *id.* at 51, and "what do you sleep in?," *id.* at 48. Indeed, a welding department supervisor, John Nicholas, testified that he personally had used the first two of these phrases, as well as "put some hair around it." 7 T.T. at 229, 235. Banks testified Nicholas remarked to her that she would "go to hell for culling pussy," 3 T.T. at 42, a remark which Nicholas denied, 7 T.T. at 226. Banks testified that Herbert Kennedy, a foreman, told her that "she's sitting on a goldmine," 3 T.T. at 49–50, a phrase that Nicholas testified he had heard used in the shipyards, 7 T.T. at 229, although Nicholas did not name any person who used the phrase.

(d) receiving verbal abuse from a rigger named Hawkins. On one occasion Hawkins belittled Banks' concern over a large rat by making a quip that Banks took to be a sexual reference. 3 T.T. at 43–44. The following day Hawkins humiliated Banks by stating, in front of a large group of male coworkers, "if you fell into a barrel of dicks, you'd come up sucking your thumb." *Id.* at 42–48.

(e) receiving a variety of harassment from a rigger named John Fraser. Fraser sniffed at Banks' behind while she was walking up a gangway, producing laughter from the group of men observing the incident. 3 T.T. at 53–54. Fraser also placed a large flashlight in his pants in Banks' presence to create the illusion of a large penis. *Id.* at 54–55. (Fraser admitted that he had done this with a flashlight, but denied that it was done in Banks' presence. 8 T.T. at 125.) Fraser once so bothered Banks during a bus ride at work that she swore at him and felt compelled to immedi-

ately report his actions, first to her leaderman, then his leaderman. 3 T.T. at 55–57. His leaderman, Eugene Sharpe ("Sharpe"), responded in a fashion that left Banks feeling humiliated. *Id.* at 57–59. In fact, Banks was summoned before her supervisor the next day and called to task for having sworn at Fraser. *Id.* at 60–68.

(f) suffering the embarrassment of having a shipfitter leaderman, Ernie Edenfield ("Edenfield"), hold a chipping hammer handle, which was whittled to resemble a penis, near her face while he told her to open her mouth. 3 T.T. at 83–86. (Edenfield denied having done this. 7 T.T. at 164–65.)

(g) enduring the unwelcome advances of a coworker, a pipefitter named Romeo Bascuguin, who pursued her for dates and talked explicitly about his reputed sexual prowess. 3 T.T. at 72–81, 173–77. Banks complained to Kiedrowski about Bascuguin's advances and Kiedrowski spoke to him about his behavior. 8 T.T. at 94–95. Banks also testified to two other incidents involving calls to her home by JSI employees, including a supervisor, who expressed sexual interest in her. 3 T.T. at 126–30.[3]

35. Banks observed pictures of nude and partially nude women throughout the workplace at JSI. 3 T.T. at 114–17, 120–22, 124. She did not take as great offense at the pictures as Robinson did, but Banks stated that she steered clear of men who worked where such pictures were displayed because she came to expect more harassment from those men. 3 T.T. at 125, 179–80.

36. Following Robinson's complaints to management about the pictures of nude or partially nude women, Banks observed an increase in the number of pictures and in the objectionableness of their content. 3 T.T. at 88, 94, 123. On two occasions when

---

**3.** While incidents outside the workplace do not provide a basis for concluding that the workplace is sexually hostile, the circumstances of these two incidents make them worthy of this brief notation in order to develop fully the record respecting the degree to which the work environment shaped attitudes that transcended the confines of the shipyards.

Banks was the only woman on the company bus, male coworkers displayed or read from pornographic magazines. *Id.* at 103–04, 109–11. Banks also testified concerning two occasions in which male coworkers posted pictures with an apparent animus toward Robinson. A coworker, Chris Lay, showed a number of men, and Banks, a picture of a nude woman with a welding shield. He remarked, "Lois would really like this," and placed it on the wall in the welding trailer aboard the *U.S.S. Saratoga. Id.* at 97–98. Banks removed the picture when the men had left. *Id.* at 98. Approximately the same time, some male pipefitters placed a picture of a nude woman on Robinson's toolbox. Banks removed it, but another picture was placed there and subsequently discovered by Robinson. *Id.* at 100–03.

37. Albert, a machinist at JSI from 1976 to 1986, testified to a description of the work environment consistent with that described by Robinson and Banks. She related sexual comments identical to or similar to those heard by Robinson and Banks, *see* 4 T.T. at 32–36, 75–77, and noted that the recollection of specific incidents was hampered by the commonplace, daily nature of the comments, *id.* In one noteworthy incident, a male coworker persistently propositioned Albert, prompting her to complain to her leaderman and assistant foreman. The propositions continued after those individuals spoke to the coworker. When he finally put his hands on Albert, she responded both verbally and physically. Thereafter the coworker was fired, although the circumstances in the record of his discharge do not indicate whether the discharge was for the sexually harassing behavior or for drunkenness and sleeping on the job. *See id.* at 54–56.

38. Albert also testified to the pervasive presence of pictures of nude and partially nude women throughout the shipyards, and the increase of male employee attention to such pictures following Robinson's complaints over the presence of the pictures. Among the incidents to which she credibly testified:

(a) observing a large poster of a nude woman with profuse hair growing down the centerline of her body posted on a wall in the transportation department. 4 T.T. at 10–13. A male coworker asked Albert if she had similar hair. *Id.*

(b) observing the vendors' advertising calendars previously described, the "girlie" magazines kept in the outside machine shop trailer desk drawer, and a variety of men's adult magazines, such as *Playboy, Penthouse, Cheri, Chic,* and foreign titles, kept in trailers and carried by male employees in their back pockets. *Id.* at 13–20.

(c) finding a foreign magazine, left open on a table in the shipfitters' trailer, containing a picture of two women engaged in a sexual act while a nude man watched. *Id.* at 21–23.

(d) being shown a picture of a nude woman engaged in a pose of masturbation by Sharpe, a leaderman in the rigging department. *Id.* at 25–26.

(e) being shown a picture of a nude man by Steven Leach ("Leach"), a leaderman in the shipfitting department. *Id.* at 26–28. This incident occurred after Robinson's complaints concerning pictures in the shipyards. Albert also testified that Leach would engage in teasing behavior directed toward Robinson and other women by closing a book in his hand and declaring, "we can't let her see that." *Id.* at 73–74.

(f) observing pictures of scantily-dressed women in garters and brassieres with tassels in Lovett's office in 1984 or 1985. *Id.* at 24–25.

### Admissions by Male Employees and Supervisors

39. Defendants have admitted that pictures of nude or partially nude women have been posted in the shipfitters' trailer at the Mayport Yard during Robinson's employment at JSI. *See* Kiedrowski Depo. at 18–19; Jt.Exh. No. 2 (calendar actually posted in that office); 7 T.T. at 173–74 (Edenfield's description of "obscene pictures" posted); 8 T.T. at 106–07. Defendants and their agents also have admitted

that these kinds of photographs have been displayed in and around the fab shop at the Mayport Yard. Lovett Depo. at 30–31; 7 T.T. at 56.

40. The few witnesses who claimed never to have seen pictures such as those described by Robinson, Banks, and Albert, *e.g.*, 6 T.T. at 227 (Yeomans); 7 T.T. at 205 (Martin), cannot be credited given the weight of the credible and corroborated testimony to the contrary.

41. Based on the foregoing, the Court finds that sexually harassing behavior occurred throughout the JSI working environment with both frequency and intensity over the relevant time period. Robinson did not welcome such behavior.

Effect of JSI Work
Environment on Women

42. The foregoing evidence was supplemented with the testimony of various experts. Plaintiff called experts in the fields of sexual stereotyping and sexual harassment; defendants presented expert testimony on the relative offensiveness of pornographic materials to men and women.

*Plaintiff's Expert Witness Testimony*

43. Dr. Susan Fiske appeared as an expert witness on plaintiff's behalf to testify on the subject of sexual stereotyping. Dr. Fiske holds a full professorship in the psychology department at the University of Massachusetts at Amherst. Her credentials in the field of stereotyping are impressive. She is a member of the American Psychological Association and the Society for Experimental Social Psychology. Dr. Fiske has performed research for the National Science Foundation and the National Institute of Mental Health. She has published nearly forty articles in the top journals in her field. She generally does not accept offers to appear as an expert witness, having turned down fourteen such offers and having appeared as an expert previously only once, in the case *Hopkins v. Price Waterhouse*, 618 F.Supp. 1109 (D.D.C.1985), *aff'd in relevant part*, 825 F.2d 458, 467 (D.C.Cir.1987), *rev'd on other grounds*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *on remand*, 737 F.Supp. 1202 (D.D.C.1990), *aff'd*, 920 F.2d 967 (D.C.Cir.1990). Her testimony and expertise were well-regarded in that case. The Court accepted Dr. Fiske, without objection, as an expert in stereotyping.

44. The study of stereotyping is the study of category-based responses in the human thought and perceptual processes. Stereotyping, prejudice, and discrimination are the three basic kinds of category-based responses. Stereotyping exists primarily as a thought process, prejudice develops as an emotional or an evaluative process, primarily negative in nature, while discrimination manifests itself as a behavioral response. 4 T.T. at 177–78. Discrimination in this context is defined by the treatment of a person differently and less favorably because of the category to which that person belongs. *Id.* at 178–79. Either stereotyping or prejudice may form the basis for discrimination.

45. To categorize people along certain lines means their suitability will be evaluated in these terms as well. In the process of perceiving people as divided into groups, a person tends to maximize the differences among groups, exaggerating those differences, and minimize the differences within groups. 4 T.T. at 179–80. In practice, this translates into a perception that women are more similar to other women and more different from men (and vice versa) than they actually may be. *Id.* This perceptual process produces the in-group/out-group phenomenon: members of the other group or groups are viewed less favorably. *Id.* at 181. This categorizing process can produce discriminatory results in employment settings if it leads a person in that job setting to judge another person based on some quality unrelated to job performance into which the other person falls.

46. For example, when a superior categorizes a female employee based on her sex, that superior evaluates her in terms of characteristics that comport with stereotypes assigned to women rather than in terms of her job skills and performance. 4 T.T. at 182. Thus, to categorize a female employee along the lines of sex produces an evaluation of her suitability as a "woman" who might be expected to be sexy,

affectionate and attractive; this female employee would be evaluated less favorably if she is seen as not conforming to that model without regard for her job performance. *Id.* at 183; 5 T.T. at 26–27. Interestingly, this example is borne out in testimony by several witnesses called by defendants, who expressed disapproval of Robinson's demeanor because she did not meet the expectation of "affectionate" female behavior, *see, e.g.,* 5 T.T. at 197 (Leach); 7 T.T. at 18 (Starling); *id.* at 180 (Meyder); *id.* at 195 (Bright); 8 T.T. at 151–53 (Lowder), or who expressed disapproval of Banks' use of "crude" language as inappropriate behavior for a "lady," *see, e.g.,* 7 T.T. at 159–61 (George Livingston).

47. Dr. Fiske reviewed documentation in this case, including fifteen depositions of male and female JSI employees, defendants' responses to plaintiff's requests for admissions, and the EEO-1 reports prepared by JSI. Based on this review, she concluded, "the conditions exist for sex stereotyping at Jacksonville Shipyards and ... many of the effects of sex stereotyping exist...." 4 T.T. at 177. Dr. Fiske described the sex stereotyping at JSI as a situation of "sex role spillover," where the evaluation of women employees by their coworkers and supervisors takes place in terms of the sexuality of the women and their worth as sex objects rather than their merit as craft workers. *Id.* at 183.

48. Dr. Fiske identified several preconditions that enhance the presence of stereotyping in a workplace. The four categories of preconditions are: (1) rarity; (2) priming (or category accessibility); (3) work environment structure; and (4) ambience of the work environment. Stereotyping may occur in the absence of these conditions; studies have demonstrated, however, a statistically significant correlation between these preconditions and the prevalence of stereotyping. 5 T.T. at 17, 30–31, 41. All of the preconditions are present in the work environment at JSI.

49. "Rarity" exists when an individual's group is small in number in relation to its contrasting group, so that each individual member is seen as one of a kind—a solo or near solo. Rarity or "solo" status exists when an individual's group comprises fifteen to twenty percent or less of the work force in the relevant work environment. 5 T.T. at 13. Women at JSI in general occupy solo status and rarity is extreme for women in the skilled crafts. *See supra* FOF ¶ 16.

50. Solos capture the attention of the members of the majority group, providing fodder for their rumors and constantly receiving their scrutiny. 4 T.T. at 186. The solo is far more likely to become the victim of stereotyping than a member of the majority group, and the stereotype develops along the dimension that makes the solos rare. *Id.* at 187; 5 T.T. at 15–17. Solos typically elicit extreme responses from members of the majority group. Thus, mildly substandard work performance or workplace behavior is perceived as much worse when a solo is the worker than when a member of the majority group is responsible. 4 T.T. at 187. According to Dr. Fiske, the studies concerning the perception of solo work performance and behavior demonstrate that the solo status *per se,* not the behavior, produces the extreme reaction from other people. *Id.* at 187–88.

51. The second precondition for stereotyping, "priming" or "category accessibility", is a process in which specific stimuli in the work environment prime certain categories for the application of stereotypical thinking. 4 T.T. at 189. The priming impact created by the availability of photographs of nude and partially nude women, sexual joking, and sexual slurs holds particular application in the JSI workplace. *Id.* at 189–90.

52. Dr. Fiske testified these stimuli may encourage a significant proportion of the male population in the workforce to view and interact with women coworkers as if those women are sex objects. 4 T.T. at 192–94. She described one study, Mohr & Zanna, *Treating Women as Sex Objects: Look to the (Gender Schematic) Male Who Has Viewed Pornography,* 16 PERS. & SOC. PSYCH. BULL. 296 (1990), which in her view confirmed this proposition. This study used randomly assigned male college students as subjects who viewed either a nonviolent, "fairly normal sexual" pornograph-

ic film or a film having no pornographic content. Subsequently, a woman interviewed the subjects without knowing which film they watched. Two effects emerged. First, the males who viewed the pornographic film remembered little about the female interviewer other than her physical attributes. The males who viewed the neutral film remembered the contents of the interview. Second, the female interviewer could reliably distinguish between the males who had seen the pornographic films and those who had not because the conduct of the former group during the interviews was different. These two results held for approximately half of the men who viewed the pornographic films, those men who fit the description "sex role schematic." These men are oriented to their masculinity and their sexuality as an important part of their self-concept. 4 T.T. at 190–92. This proportion—about half of the men fitting the description of sex role schematic—holds for the general population. 4 T.T. at 192.

53. The testimony of witnesses confirms a correlation between the presence of pictures and sexual comments and the level of sexual preoccupation of some of the male workers whose conduct had sexual overtones observable by female workers.

54. The third precondition for an increased frequency of stereotyping is the nature of the power structure or hierarchy in the work environment. This factor examines the group affiliation of the persons in the positions of power and the degree to which particular groups are given a sense of belonging. At JSI, this precondition arises because the people affected by the sexualized working conditions are women and the people deciding what to do about it are men. The in-group/out-group effect diminishes the impact of the women's concerns. The men who receive the complaints perceive those complaints less favorably and take them less seriously because they come from women. 5 T.T. at 4–5. Specific instances of the handling of complaints of sexual harassment, developed *infra,* demonstrate the phenomenon of male supervisors trivializing the valid complaints of Robinson and other female workers.

55. Dr. Fiske addressed a hypothetical concerning the effect of a sexualized workplace on a complaint lodged by a female employee. 5 T.T. at 6–8. This hypothetical involved a work environment where women are solos and men control the power structure. A woman complains about a man who exposed himself to her. Dr. Fiske predicted that, where sexualization of the workplace has occurred, the woman lodging the complaint would be the focus of attention, rather than the misconduct of which she complains. The woman would be perceived as the problem; she might be subject to ridicule and become the subject of rumors. The man likely would not be disciplined commensurate with the misconduct. Dr. Fiske's prediction is borne out in part by Albert's testimony concerning two male coworkers' discussion of an incident at JSI in which a male employee had exposed himself to a female employee. *See* 4 T.T. at 37–39; *see also* 6 T.T. at 37 (Stewart dismissing gravity of complaint as "one person's word against another's").

56. In a like manner, Dr. Fiske predicted that a female employee who complained about sexual pictures of women would, in the hypothetical environment, find that she is perceived as the problem and dismissed as a complainer. 5 T.T. at 9–11. The content of the speculations and reactions to the complainer, in a sexualized work environment, would focus on her sexuality. Aspersions may be cast on the sexuality of the complaining employee regarding, for example, her sexual preference, background, experiences or traumas. Dr. Fiske found it unsurprising that male employees at JSI entertained such derogatory rumors concerning Robinson. *Id.* at 11; *see also* Leach Depo. at 47 (describing rumors about Robinson's sexuality).

57. The fourth precondition is the ambience of the work environment. According to Dr. Fiske, studies show that the tolerance of nonprofessional conduct promotes the stereotyping of women in terms of their sex object status. For instance, when profanity is evident, women are three times more likely to be treated as sex objects than in a workplace where profanity is not tolerated. 4 T.T. at 195–96. When sexual

joking is common in a work environment, stereotyping of women in terms of their sex object status is three to seven times more likely to occur. 5 T.T. at 5. These results obtain for a wide range of employment settings, including settings in which women hold nontraditional jobs.

58. Nonprofessional ambience imposes much harsher effects on women than on men. The general principle, as stated by Dr. Fiske, is "when sex comes into the workplace, women are profoundly affected ... in their job performance and in their ability to do their jobs without being bothered by it." 4 T.T. at 197. The effects encompass emotional upset, *id.,* reduced job satisfaction, 5 T.T. at 18, the deterrence of women from seeking jobs or promotions, 4 T.T. at 198, and an increase of women quitting jobs, getting transferred, or being fired because of the sexualization of the workplace, *id.* By contrast, the effect of the sexualization of the workplace is "vanishingly small" for men. *Id.* at 197–98.

59. Men and women respond to sex issues in the workplace to a degree that exceeds normal differences in other perceptual reactions between them. 4 T.T. at 198. For example, research reveals a near flip-flop of attitudes when both men and women were asked what their response would be to being sexually approached in the workplace. Approximately two-thirds of the men responded that they would be flattered; only fifteen percent would feel insulted. For the women the proportions are reversed. *Id.*

60. The sexualization of the workplace imposes burdens on women that are not borne by men. 4 T.T. at 199. Women must constantly monitor their behavior to determine whether they are eliciting sexual attention. They must conform their behavior to the existence of the sexual stereotyping either by becoming sexy and responsive to the men who flirt with them or by becoming rigid, standoffish, and distant so as to make it clear that they are not interested in the status of sex object. *Id.*

61. Two major effects of stereotyping were described by Dr. Fiske. One effect is selective interpretation. The individual who engages in stereotyping of another person because of that person's membership in a minority group selectively interprets behavior of the other person along the lines of the stereotypes applied to the group. 4 T.T. at 200–01. Thus, an employer may respond to a complaint by a female employee by stereotyping her as "an overly emotional woman," and thereafter ignore her complaints as exaggerated or insignificant. *Id.* at 201. (Behavior of this sort is apparent in JSI's responses to female complaints concerning sexual harassment described *infra.*) A second effect of stereotyping is denigration of the individual merit of the person who is stereotyped. *Id.* The presence of stereotyping in the workplace affects the job turnover and job satisfaction of the members of the group subjected to stereotyping. *Id.* at 199–200; 5 T.T. at 18.

62. Dr. Fiske's testimony provided a sound, credible theoretical framework from which to conclude that the presence of pictures of nude and partially nude women, sexual comments, sexual joking, and other behaviors previously described creates and contributes to a sexually hostile work environment. Moreover, this framework provides an evidentiary basis for concluding that a sexualized working environment is abusive to a woman because of her sex. Defendants did not provide any basis to question the theory of stereotyping and its relationship to the work environment. It appears to the Court that the primary concern raised by defendants concerning Dr. Fiske's testimony was the materials upon which she relied for a description of the JSI workplace. The Court is of the opinion that the more credible testimony describing the JSI workplace supports the assumptions upon which Dr. Fiske relied.

63. Ms. K.C. Wagner appeared as an expert witness on plaintiff's behalf to testify on common patterns and responses to sexual harassment and remedial steps. (Ms. Wagner's testimony concerning prevention of harassment at JSI is discussed *infra* on the matter of appropriate remedies.) Ms. Wagner is a self-employed consultant in the area of issues regarding women and the work environment, with particular emphasis on the prevention of

sexual harassment on the job. She worked for the Working Women's Institute, an organization devoted to the study and remedy of sexual harassment in the workplace, for seven years, where she held positions as counseling director and program director before being named executive director. She holds a master's degree in social work from Hunter College. She has been an instructor in sexual harassment courses for managers and human relations specialists. She has been a consultant to employers to train supervisors and employees concerning sexual harassment and she also has been a consultant to an organization called Women in the Trades. Her expertise and experience concerning women in nontraditional employment settings is impressive. The Court accepted Ms. Wagner, over the objection of defendants, as an expert on common patterns and responses to sexual harassment and accepted her, without objection, as an expert in education and training relative to sexual harassment.

64. According to Ms. Wagner, women in nontraditional employment who form a small minority of the workforce are at particular risk of suffering male worker behaviors such as sexual teasing, sexual joking, and the display of materials of a sexual nature. This proposition finds support in the published research and in Ms. Wagner's own experience in counseling over two hundred women in nontraditional work who have suffered such harassment and her experience in training over two hundred and fifty firefighters in New York City regarding the prevention and identification of sexual harassment. 4 T.T. at 94–96.

65. Ms. Wagner expressed her expert opinion that sexually harassing conditions for female employees exist at JSI. Her conclusion rests on the presence of indicators of sexually harassing behaviors and of a sexually hostile work environment, including evidence of a range of behaviors and conditions that are considered sexually harassing, evidence of common coping patterns by individual victims of sexual harassment, evidence of stress effects suffered by those women, evidence of male worker behavior and attitudes, and evidence of confused management response to complaints of sexual harassment. 4 T.T. at 92–93. In reaching her conclusion, she reviewed a variety of depositions of female employees at JSI, defendants' answers to interrogatories and defendants' responses to plaintiff's requests for admissions. *Id.* at 91. She read these materials for the purpose of identifying these indicators, presuming the truth of the contents of the materials. *Id.* at 92, 129–30.

66. According to Ms. Wagner, women respond to sexually harassing behavior in a variety of reasonable ways. The coping strategy a woman selects depends on her personal style, the type of incident, and her expectation that the situation is susceptible to resolution. 4 T.T. at 96. Typical coping methods include: (1) denying the impact of the event, blocking it out; (2) avoiding the workplace or the harasser, for instance, by taking sick leave or otherwise being absent; (3) telling the harasser to stop; (4) engaging in joking or other banter in the language of the workplace in order to defuse the situation; and (5) threatening to make or actually making an informal or formal complaint. *Id.* at 96–102.

67. Of these five categories, formal complaint is the most rare because the victim of harassment fears an escalation of the problem, retaliation from the harasser, and embarrassment in the process of reporting. 4 T.T. at 103–04. Victims also often fear that nothing will be done and they will be blamed for the incident. *Id.* Thus, the absence of reporting of sexual harassment incidents cannot be viewed as an absence of such incidents from the workplace. *Id.* at 169. An effective policy for controlling sexual harassment cannot rely on ad hoc incident-by-incident reporting and investigation. *Id.* at 169–70.

68. Victims of sexual harassment suffer stress effects from the harassment. Stress as a result of sexual harassment is recognized as a specific, diagnosable problem by the American Psychiatric Association. 4 T.T. at 109. Among the stress effects suffered is "work performance stress," which includes distraction from tasks, dread of work, and an inability to work. *Id.* at 105. Another form is "emotional stress," which

covers a range of responses, including anger, fear of physical safety, anxiety, depression, guilt, humiliation, and embarrassment. *Id.* Physical stress also results from sexual harassment; it may manifest itself as sleeping problems, headaches, weight changes, and other physical ailments. *Id.* at 106. A study by the Working Women's Institute found that ninety-six percent of sexual harassment victims experienced emotional stress, forty-five percent suffered work performance stress, and thirty-five percent were inflicted with physical stress problems. *Id.* at 105.

69. Sexual harassment has a cumulative, eroding effect on the victim's well-being. 4 T.T. at 106–08. When women feel a need to maintain vigilance against the next incident of harassment, the stress is increased tremendously. *Id.* at 107. When women feel that their individual complaints will not change the work environment materially, the ensuing sense of despair further compounds the stress. *Id.* at 107–08.

70. Management's perception concerning the scope and range of sexual harassment provides an important indicator of the hostility of the work environment. 4 T.T. at 110. The more subtle forms of sexual harassment, such as sexual comments, sexual teasing, and leering, often fall outside management's perception. *Id.* As a general proposition, the higher an individual is on the management ladder, the more likely he is to regard sexual harassment as an exaggerated problem and the more likely he is to minimize complaints from women concerning what they perceive to be harassing behavior. *Id.* at 110–11.

71. Men and women perceive the existence of sexual harassment differently. 4 T.T. at 110–11. Ms. Wagner testified that the differential perception of sexual harassment is borne out by her own experiences and by survey research. A study of federal employees by the Merit Systems Protection Board found that 11 to 12 percent more women than men characterized sexual remarks or materials of a sexual nature in the workplace as sexual harassment. *Id.* at 163–67. Regarding the second of these categories, which consisted of letters, calls and materials of a sexual nature, including materials depicting sexually provocative poses, nude, and partially nude pictures, 87 percent of the women considered this behavior to constitute sexual harassment, in contrast to 76 percent of the men. *Id.* at 167.

72. Male coworkers often fail to see any potential for harassment in their behavior because they believe that only the behavior of supervisors can contribute to a sexually hostile work environment. 4 T.T. at 113–14.

73. Ms. Wagner's testimony provided a credible, sound explanation for the variety of responses to harassing behavior at JSI to which other witnesses testified.[4] Moreover, her framework explains why some women may not feel offended by some behaviors in the workplace that offend other women, *see, e.g.,* 7 T.T. at 205 (testimony of Donna Martin that she was not offended by sexual joking in workplace), and yet the work environment remains hostile to most women.

*Defendants' Expert Witness Testimony*

74. Dr. Donald Mosher appeared as an expert witness on defendants' behalf to testify in the area of the psychological ef-

---

4. In *Lipsett v. University of Puerto Rico,* 740 F.Supp. 921 (D.P.R.1990), *on remand from* 864 F.2d 881 (1st Cir.1988) (*rev'g* 669 F.Supp. 1188 (D.P.R.1987)), Judge Pieras denied a motion to qualify Ms. Wagner as an expert witness in a hostile work environment sex discrimination suit. The *Lipsett* case, however, is a jury action and may be distinguished for this reason. For instance, Ms. Wagner's testimony on common patterns and responses to sexual harassment directly informs the inquiry into the effect of the conditions at JSI on the psychological well-being of the hypothetical reasonable woman. Whatever merit lies in the argument that jurors may draw on their common experiences to assess the issue, the Court risks injustice if it attempts to fashion a reasonable woman's reaction out of whole cloth. The general rule applied, particularly in nonjury cases, is that "the decision by a trial court on the competency of, and what weight should be given to the testimony of, an expert is a highly discretionary one." *IMPACT v. Firestone,* 893 F.2d 1189, 1195 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 133, 112 L.Ed.2d 100 (1990). This Court is satisfied that the potential sources of bias, strengths, and weaknesses in Ms. Wagner's qualifications and testimony have been considered fully.

fects of sexual materials. He is a professor of psychology at the University of Connecticut. He has studied the effects of sexual materials for nearly thirty years. He has authored or coauthored approximately ninety publications, about one half of which concern sexuality and aggression. Dr. Mosher is on the editorial boards of the *Journal of Sex Research and Psychology and Human Sexuality.* He has testified as an expert witness in three obscenity trials and before the Meese Commission on pornography. The Court accepted Dr. Mosher as an expert in the area of the psychological effects of sexual materials.

75. Dr. Mosher prepared for his testimony by reviewing Robinson's deposition and all of the visual materials contained in Joint Exh. Nos. 1 through 7. 5 T.T. at 59. He expressed his expert opinion that those pictures do not create a serious or probable harm to the average woman. *Id.* at 61. He based his opinion on the body of scientific literature germane to pornography and on a study which he conducted as part of his preparation. *Id.* at 61–62.

76. Dr. Mosher's own study examined the reaction of 137 college women to the 1989 *Playboy* playmate calendar. 5 T.T. at 63. Eighty-nine of the women also reviewed pinups of nude men taken from *Playgirl. Id.* Dr. Mosher employed a seven-point Lippitt rating scale. In rating the offensiveness and the degrading quality of the *Playboy* playmate calendar, Dr. Mosher characterized the responses as showing "mild to low moderate in terms of being offensive or degrading." *Id.* at 64–65. The women were asked to place their response in the context of a private setting, a college setting or a work setting. The negative responses rose as the setting moved from private to college to work. *Id.* at 65. In a work setting some women reported that they would find the materials "moderately disgusting and moderately offensive," a result that Dr. Mosher interpreted as "never a seriously negative response." *Id.* Dr. Mosher concluded that this study supported the proposition that females are not adversely affected in their psychological well-being by their exposure to such materials. *Id.*

77. Dr. Mosher additionally testified that research suggests that pinups do not promote sexual aggression by men or induce calloused attitudes toward women. 5 T.T. at 67–69.

78. The Court does not accept Dr. Mosher's ultimate conclusions concerning the impact of sexual materials as pertinent to deciding the issues in this case. Dr. Mosher's study and the studies upon which he relies do not address the matter of workplace exposure to sexual materials under conditions comparable to those existing at JSI. Indeed, Dr. Mosher's subjects viewed the playmate calendars as small groups of women, not as a solo or near solo in a group of men. Dr. Mosher conceded that the element of control is a factor in a woman's reaction to sexual materials. 5 T.T. at 99–100. The more specific studies and observations undertaken by plaintiff's experts deserve greater weight. To the extent that Dr. Mosher's study is valuable, it is because the study suggests the role of context in evaluating the response of women and men to sexually-oriented materials. The relatively greater offense expressed concerning sexual materials in the workplace tends to support the propositions put forward by plaintiff's experts.

79. Dr. Joseph Scott appeared as an expert witness on defendants' behalf to testify in the area of the effects of sexual materials on behavior and generally on men and women. Dr. Scott is an associate professor in the Department of Sociology of Ohio State University. He has published approximately forty articles in professional journals and three books, with a fourth book in progress. He received some of his training at the Kinsey Sex Institute as a National Institute of Mental Health fellow. He has received honors from the Western Society of Criminology and the American Society of Criminology. He has been an expert witness in many obscenity trials. A controversial methodology used by Dr. Scott in some obscenity trials, ethnography analysis, has been criticized by some courts, but Dr. Scott stated that his testimony in this case did not rest on any studies using this methodology. Dr. Scott has done contract work paid for by the

publishers of what he called "male sophisticate magazines," that is, *Playboy, Penthouse, Hustler,* and the like; he would not disclose further details on such research but he did give assurance that his opinions did not rest on any of these studies. The Court accepted Dr. Scott as an expert as offered.

80. Dr. Scott prepared for his testimony by reviewing Robinson's deposition and the visual materials contained in Joint Exh. Nos. 1 through 7. 5 T.T. at 129–30. He expressed his expert opinion that "the average female would not be substantially effective [sic] in a negative manner" by the materials, that is, she would not take offense at them. *Id.* at 130–31. He further stated that women in the workforce would be slightly more offended by such materials than men. *Id.* at 131. He based his opinion upon surveys which he conducted himself and surveys conducted by other people on the effects of sexual materials. *Id.* One of the studies upon which he relied is a study of the offensiveness to the raters of the contents of *Hustler* magazine. *Id.* at 105, 131.

81. Dr. Scott described the *Hustler* study as his only workplace setting study. 5 T.T. at 118. In this study the females rated the cartoons and the pictorials to be less offensive than the males did, *id.* at 131–32, although the level of offensiveness was low for both groups, *id.* at 135. The methodology of the study, however, diminishes its application to the workplace. The subjects were twelve college student volunteers, six men and six women. *Id.* at 141. They viewed the materials at their own leisure, alone or at their own table in a room with three tables. *Id.* at 140–41. The primary focus of the study was the content of the pictures and cartoons, not the reactions of the individuals. *Id.* at 143. Dr. Scott's testimony about the offensiveness of sexual materials to working women relies on survey results in which individuals are questioned about their attitudes toward such materials and this information is correlated with their employment status and gender. *Id.* at 137–38.

82. Dr. Scott testified that no research of which he is aware indicates that exposure to sexual materials similar to Joint Exh. Nos. 1 through 7 will prompt males to act more aggressively or threateningly toward females. 5 T.T. at 136. Under cross-examination Dr. Scott admitted his lack of familiarity with one researcher's work that reached results contrary to his conclusion. *Id.* at 147–50.

83. The Court does not accept Dr. Scott's expert testimony as useful to the determination of the issues in this case. His opinions provide a basis for evaluating the offensiveness of sexual materials in the abstract only. The important element of context is missing; the sexually harassing impact of the materials must be measured in the circumstances of the JSI work environment. Dr. Scott's testimony does not assist in this effort.

*Defendants' Social Context Evidence*

84. Defendants introduced into evidence several examples of magazines often purchased by women in which complete or partial nudity, sexual cartoons, and sexually frank articles appear. *See* D.Exh. Nos. 13 (*Cosmopolitan,* Sept. 1987), 14 (*Glamour,* Sept. 1987), 15 (*Ms.,* Sept. 1987), 16 (*Vanity Fair,* Oct.1987). Dr. Scott testified that the sexual explicitness of these magazines reflects a recent trend for "women's magazines." 5 T.T. at 134. In addition, a picture of a statue in the Duval County Courthouse, in which a female figure's breasts are exposed, was introduced into evidence. D.Exh. No. 4.

85. Defendants also solicited evidence about the conditions at two other shipyards, Norfolk Shipbuilding and Drydock Corp. (NORSHIPCO) and Colona Shipyard. Harvey Williams worked in employee relations positions at both facilities (NORSHIPCO from 1956 to 1982 and Colona from 1986 to 1988) and testified about his experiences. NORSHIPCO is comparable in size to JSI while Colona is considerably smaller. Both have workforces in which approximately 10 to 15 percent of the employees are female. Pictures of nude and partially nude women are posted in the shops and locker rooms, but no complaints about the pictures were filed at either site during Williams' tenure. 8 T.T. at 53–62.

Williams did not provide any other details concerning the work environment at these shipyards.

86. For the reasons stated in Conclusions of Law ("COL") ¶ 15, the Court finds that this "social context" evidence has little to no value in determining the issues of this case. If this type of evidence were material, the Court finds considerable weakness in defendants' presentation. The magazines introduced into evidence do not form a basis to suggest the extent to which sexually frank or sexually explicit materials are accepted by women; no circulation figures were introduced and no evidence suggests the acceptance of the sexually frank material by female subscribers or readers. The absence of formal complaints at NORSHIPCO and Colona does not tell whether their work environments are hostile; plaintiff's expert witnesses testified that a lack of complaints does not indicate the level of hostility. Moreover, the professional relations between men and women may be otherwise so favorable that the presence of sexually-oriented pictures does not threaten the relationship; the percentage of women in the workforces at both shipyards is much higher than at JSI. Because of these weaknesses, the Court finds the social context evidence inadequate to draw reliable conclusions concerning the reaction of women to sexually-oriented pictures in the workplace.

### JSI Responses to Sexual Harassment Complaints

#### *Sexual Harassment Policy from 1980 to 1987*

87. JSI adopted its first policy dealing specifically with sexual harassment in 1980. It was part of a policy statement from an executive vice-president of JSI titled "Equal Employment Opportunity," dated June 17, 1980. D.Exh. No. 9. It stated, in pertinent part:

> we should all be sensitive to the kind of conduct which is personally offensive to others. Abusing the dignity of anyone through ethnic, sexist or racial slurs, suggestive remarks, physical advances or intimidation, sexual or otherwise, is not the kind of conduct that can be tolerated.

> If any employee feels that they are [sic] the object of such conduct, it should be reported immediately to the EEO coordinator at this facility.

*Id.* This policy statement was apparently posted in all shops and offices at both the Commercial Yard and the Mayport Yard and near the time clock at the Mayport Yard. P.Exh. No. 1/A–1/F (answer to question 12(b)); 6 T.T. at 158–60; 8 T.T. at 156–57.

88. This policy fell short of effectiveness in several respects. The EEO coordinator was not named and the identity of this person was not widely known. *See* 1 T.T. at 137; 4 T.T. at 41. JSI did not distribute the policy commensurate with other important company policies. For example, the standard JSI rule book, Jt.Exh. No. 12, did not incorporate the policy, 8 T.T. at 189, although this book is the source for the rules upon which employees rely to govern their conduct in the workplace, *see* Turner Depo. at 61–62, 71–72. While safety policies sometimes are distributed with employee daily time cards, 6 T.T. at 141, the sexual harassment policy did not receive such distribution. Prior to April 1987, many employees and some of the defendants (defendants admitted to Owens' lack of knowledge) were unaware of the sexual harassment policy. *See, e.g.,* 1 T.T. at 136 (Robinson); 4 T.T. at 40–41 (Albert); Kiedrowski Depo. at 10.

89. The handling of several sexual harassment complaints between 1980 and 1987 illustrates the ineffectiveness of the policy.

(a) When Banks suffered harassment from a rigger, John Fraser, on a company bus, *see supra* FOF ¶ 34(e), she initially complained to Sharpe, the rigging leaderman. Banks testified that Sharpe placed his arm around her shoulder and said, "Well, don't worry about it. Let me blow in your ear and I'll take care of anything that comes up." 3 T.T. at 52–58. The latter phrase refers to a sophomoric shipyard joke involving a man's erection. *Id.* at 58; McMillan Depo. at 138–39. Banks was summoned to a

meeting the next day at which Fraser demanded an apology for Banks' profanity directed at him in response to his harassment. Herbert Kennedy, a foreman present at the meeting, interrupted an emotionally distraught Banks and told her to shut up, stop crying, return to work, or face being fired. 3 T.T. at 60–68; 5 T.T. at 186–89. Fraser was not reprimanded for his behavior. Kennedy conducted a cursory investigation of Banks' complaint about Sharpe, but this investigation was limited to a conversation with Sharpe and those witnesses suggested by Sharpe. Kennedy did not request the names of prospective witnesses from Banks. Based on this limited investigation, Kennedy determined that Sharpe had not committed any misconduct. 7 T.T. at 99–106, 111–13.

(b) When Banks endured harassment from a rigger named Hawkins in the form of a humiliating comment from him, *see supra* FOF ¶ 34(d), Banks complained to the assistant welding foreman, John Nicholas. Nicholas testified that he was an appropriate person to hear her complaint on this matter. 7 T.T. at 238–39. Banks testified that when she complained to Nicholas, he thought the comment was funny, 3 T.T. at 47–48; Nicholas testified that when Banks repeated the offensive comment to him, he "probably grinned." 7 T.T. at 230. Banks felt deterred from further pursuing the matter as a result of Nicholas' reaction. 3 T.T. at 161.

(c) When Robinson suffered abusive language from a shipfitter, George Nelson, *see supra* FOF ¶ 28, her complaint to her supervisor, assistant welding foreman John McLean, resulted in an informal conversation between McLean and Nelson. McLean, however, took no steps to document his actions and did not report the fact of the complaint to Nelson's superiors in the shipfitting department. 7 T.T. at 143–47.

(d) When Karen Gamble ("Gamble"), a paint and labor shop employee at the Mayport Yard, lodged a formal complaint with Stewart, the ensuing investigation reflected a lack of appreciation for the seriousness of the complaint. According to the memorandum introduced into evidence by defendants, D.Exh. No. 24, Gamble initially reported her complaint, concerning unwanted sexual remarks and touching by a male coworker, to her leaderman, who then spoke to the male coworker. The leaderman explained his actions to Gamble and told her if she was not satisfied, she could register a complaint with the foreman. Gamble took the matter to Stewart, who contacted Ahlwardt, who in turn delegated investigatory responsibility to E.E. Hastey, an assistant night shift superintendent. See 8 T.T. at 187–88. Hastey gathered together Gamble, the male coworker of whom she complained, her foreman and two leadermen. Hastey had each person concerned recount the circumstances. Thereafter, he suggested the matter be settled there "as amicably as possible." He further suggested that an apology should suffice, and the offender apologized. Gamble accepted the apology, and the foreman asked her to repeat her acceptance. Hastey warned the offender against future misconduct and the foreman gave him a verbal warning. Hastey's memorandum, D.Exh. No. 24, was not placed in the offender's personnel file, 8 T.T. at 185, and the record does not indicate any other documentation of the events in his file. The most striking aspect of the handling of Gamble's complaint, however, is the urging by a high management official that she accept an apology as full settlement of her complaint, under circumstances that exerted great pressure on her to follow this management suggestion, when she had indicated through her formal complaint that she was unsatisfied with informal steps of the same kind taken by her leaderman.

90. The failure to document complaints of sexual harassment is commonplace at JSI. The company has no system to record concerns raised about sexual harassment; no instructions to document harassment complaints have been given to leadermen, quartermen, foremen, or superior management employees. 6 T.T. at 14–16. This gap in the sexual harassment policy left higher management unaware, until the prosecution of this lawsuit, of the fact that one JSI employee, Morris Green, had twice been the subject of complaints from female employees to lower level management employees about Green's lewd, sexual behavior at work. 6 T.T. at 27–28; 46–47. Both foremen to whom the complaints were made told Green that a further offense would result in discipline, but neither foreman disciplined him (even though he admitted the offenses and the second foreman was aware of the prior complaint). McMillan Depo. at 122–29; Wingate Depo. at 46–49.

91. Female employees lacked confidence in the willingness and commitment of JSI to take steps to halt sexually harassing behavior. Consequently, Robinson, Banks, and Albert adopted personal strategies for coping with the work environment. Robinson, for instance, declined to complain about degrading pictures and comments at the beginning of her employment because she feared that she might be subjected to retaliation and that the complaints would not be well-received. 1 T.T. at 92–95. These findings of fact bear out the validity of her fears. Banks also declined to complain about many instances of harassment because she feared ridicule and she felt that management would not take effective steps to remedy the situation. 3 T.T. at 32–34, 48–49, 51–52, 58–59, 86, 147–48. Albert perceived that no discipline would be meted out against offending male employees, so she handled the situations as they arose in her own fashion, often using "smart remarks" directed to the harasser. 4 T.T. at 27–28, 33–40.

### Quartermen and Leadermen

92. Quartermen and leadermen are perceived as appropriate persons to whom to complain about work environment problems. Robinson lodged complaints about sexually-oriented pictures with Robert Fields ("Fields"), a quarterman in the welding shop at the Mayport Yard, 8 T.T. at 116–19, with Danny Miracle, a leaderman in the shipfitters' shop at the Mayport Yard, id. at 69–71, with Donald Furr ("Furr"), a leaderman in the welding shop at the Commercial Yard, 5 T.T. at 155–60, and with Kiedrowski, 8 T.T. at 91–92. Banks also lodged a harassment complaint on one occasion with a leaderman in the rigging shop at the Mayport Yard, 7 T.T. at 117, and on another occasion with Kiedrowski, 8 T.T. at 94–95. Gamble initially complained to her leaderman after a coworker made inappropriate sexual remarks and touched her body. D.Exh. No. 24. In response to a question asking to whom Robinson should have complained about work environment problems, Furr, her leaderman, testified, "I reckon I'm the one to start with." 5 T.T. at 173.

93. Quartermen and leadermen have exercised apparent authority to respond to complaints of sexually harassing behavior, have acted as conduits for the relay of complaints to higher management, and have received explicit instructions concerning their authority to exercise discretion to control the work environment. Examples of each appear in the testimony. Dan Cooney ("Cooney"), a quarterman in the shipfitters' shop at the Mayport Yard, testified that he directed a leaderman to paint over the "Men Only" sign on his own authority. 7 T.T. at 87–89. (Although conflicting testimony suggests that Cooney received an instruction from a foreman to paint over the sign, Cooney's testimony is significant for his assertion that he possessed the authority to take such action independently.) Fields and Furr each testified to instances in which they took steps to cover over offensive graffiti or pictures after a complaint from Robinson. 8 T.T. at 117–18 (Fields); 5 T.T. at 155–56 (Furr). Both men also testified to instances in which they passed along a complaint to someone higher in management. 8 T.T. at 118–19 (Fields relayed complaint about coworker to foreman); 5 T.T. at 156 (Furr relayed complaint about calendar to shift superintendent).

Cooney mentioned an occasion when he received a directive from Lovett to remove pictures and move a calendar. 7 T.T. at 70–72. Furr explained that he sought out his assistant foreman to ascertain the extent of his authority to remove pictures and the like when Robinson complained, and he was told to take whatever actions made her comfortable. 5 T.T. at 170–73. Kiedrowski asserted that, as a leaderman, he possessed the authority and had the responsibility to direct welding department employees to stop reading magazines containing pictures of nude or partially nude women on the job and to get rid of the magazines. 8 T.T. at 108. In the case of Gamble's complaint concerning sexual remarks and touching by a coworker, the assistant night shift superintendent listed among his remedial actions that he directed her leaderman "to keep a closer eye on his crew and not to let the bantering get out of hand." D.Exh. No. 24. This directive suggests a belief by management that leadermen are responsible, in part, for control of the work environment.

### Sexually–Oriented Pictures

94. Complaints about the pictures of nude and partially nude women yielded little success. On some occasions pictures were removed but subsequently were posted again or like pictures were posted in their place. *See, e.g.,* 3 T.T. at 100–03; 8 T.T. at 69–71. Even a complaint by a male shipyard worker, David Catir, who expressed concern about the visibility to visiting family members of Navy personnel of some pictures in a JSI shop trailer, went unheeded. 5 T.T. at 179–81. In one instance, a calendar about which Robinson complained was merely moved from one wall to another on the assumption that the lower visibility of the objectionable pictures would adequately address the complaint of sexual harassment. 8 T.T. at 137. On another occasion, Robinson's complaint was addressed by transferring her from the Mayport Yard. 1 T.T. at 73. On yet another occasion, when Robinson attempted to lodge a complaint with Lovett by phone, the administrative clerk in Lovett's office ignored her complaint and shifted the conversation to a criticism of her lack of respect for Lovett (because she did not ask for him as "Mr. Lovett") and of her absence from her assigned work area. 8 T.T. at 151–53.

95. The display of pictures of, and calendars featuring pictures of, nude and partially nude women was left to the discretion of the foremen of the respective shops. *See* 6 T.T. at 146–48. The evidence shows only one foreman, Ben West of the outside machine shop at the Mayport Yard, ordered the pictures of nude and partially nude women, whether pinups or calendars, off his shop's walls. This bold action, however, was attenuated by the replacement of the calendars bearing nudes with calendars showing women in provocative swimwear. 4 T.T. at 60–61.

### Robinson's January 1985 Complaints (Events Precipitating Lawsuit)

96. The present lawsuit stems from Robinson's complaints in January 1985 that pictures of nude and partially nude women were posted in the toolroom trailer and in the shipfitters' trailer aboard the *U.S.S. Saratoga* at the Mayport Yard. (Her complaint regarding the shipfitters' trailer concerned a calendar with pictures of nude and partially nude women on it, Jt.Exh. No. 2, and other pictures.) Robinson was assigned to work with the shipfitters; she checked out welding equipment from the toolroom trailer on a daily basis. Robinson initially complained to Kiedrowski, her leaderman and the most senior person in the welding department aboard ship, 8 T.T. at 97, and later to Fred Turner ("Turner"), the welding department foreman.

97. Kiedrowski's reaction to Robinson's complaint to him left her feeling embarrassed. 1 T.T. at 31–32. At trial, Kiedrowski described these events with a specificity that included a denial that he responded to Robinson's complaint with a loud "wow," but his testimony lacks credibility when contrasted with his denial in his deposition testimony that he recalled anything about the event. Robinson observed that one of the pictures in the toolroom trailer about which she complained, a color photograph of a nude blond woman, was removed

shortly after her complaint to Kiedrowski; another picture in the toolroom trailer, a black and white photograph, remained posted for several more days. *Id.* at 33. Kiedrowski disclaimed any ability to assist Robinson in securing removal of the calendar in the shipfitters' trailer. 8 T.T. at 91. Kiedrowski also told Robinson that she had no business in the shipfitters' office. 8 T.T. at 92. The basis for his scolding her on this point is unclear; Kiedrowski had previously assigned Robinson to work with the shipfitters on occasion, Kiedrowski Depo. at 33, and, when he worked as a welder, he had occasion to enter the shipfitters' office himself, 8 T.T. at 103–04.

98. In the case of Turner, Robinson approached him and expressed her complaint over the "pornography" she had seen. Turner responded, "the what?"; Robinson repeated the term "pornography" three times before Turner acknowledged that he understood that she was referring to the pinup and calendar pictures in the shipyards. 1 T.T. at 29–30. Turner testified that he directed his leaderman (Kiedrowski), his quarterman (Harris), and Banks to make the rounds of the shops aboard the *U.S.S. Saratoga* and remove any pinup pictures. 8 T.T. at 75–77. He did not direct the removal of any calendars bearing pictures of nude or partially nude women. *Id.* at 80. While Turner received a report from his group that the offending pictures had been removed, deposition and trial testimony by Owens indicate that either some pictures were missed or new pictures were posted after Turner's order. 6 T.T. at 129–30; Owens Depo. at 132–33.

99. Dissatisfied with the response within her own department, Robinson approached Edenfield, a shipfitting leaderman, to complain. 1 T.T. at 35. Edenfield told her to go back to her own office. 7 T.T. at 165–66. Robinson felt trivialized by his response. 1 T.T. at 35.

100. Robinson then telephoned Lovett, the shipfitting foreman, to complain. Lovett advised Robinson he would "look into it," but he did not subsequently speak to her about it again. 1 T.T. at 36–37; 8 T.T. at 137–38. Robinson had requested that the calendar be removed, but Lovett did not grant this request. Lovett testified that he instructed Cooney to move the calendar about which Robinson complained so that the calendar was no longer visible from outside the trailer. 8 T.T. at 137. Cooney relayed this instruction to Leach, who carried it out. 7 T.T. at 70–72. Lovett stopped by the trailer the next day to confirm that his instruction had been followed.

101. Robinson's complaints became common knowledge around the shipyards and the catalyst for a new wave of harassing behavior directed against her and other women. Banks asked Robinson at one point to cease in her shop-to-shop complaints because the male employees made a joke of it, laughed at Robinson openly, and had begun to bring in "hard pornography" that they showed to female workers. 3 T.T. at 92. Many specific incidents of sexually harassing behavior arising at this time are set forth *supra* in these findings.

102. A "Men Only" sign appeared on the door to the shipfitters' trailer after the calendar was moved. The sign was comprised of letters approximately six inches high and was written in white paint on a brown door. Cooney saw the sign and, on Lovett's order, painted over it with red paint. 7 T.T. at 73–84; 8 T.T. at 139–40. Ahlwardt observed the sign, as painted over, and directed that it be painted over again because it was still visible. 6 T.T. at 177. The legend remained visible as painted the second time. *See* D.Exh. No. 3/A, 3/B, 3/C (photographs of door after painting, taken two years later). Robinson first observed the "Men Only" sign on January 19, 1985, before it was painted over. 2 T.T. at 118. She walked to the shipfitters' office to examine it more closely and, while she was there, peered inside the trailer, discovering that the calendar about which she complained was still posted. 1 T.T. at 38–39. Edenfield spotted Robinson "snooping" in the trailer and told her to go away because she had no business there. 7 T.T. at 165–66, 169–73. Robinson complained to Kiedrowski about the sign, but he advised her that it would be replaced by an "Authorized Personnel Only" sign. 1 T.T. at 52. The following day the sign was covered with a cardboard covering. 2 T.T. at 124–25. Two days later, however, the covering

was removed and the sign had been painted over with red paint that failed to completely obscure its message. 2 T.T. at 125–26; 3 T.T. at 21.

103. Robinson decided to make a formal complaint about the discriminatory sign and the continuing presence of the pictures of nude and partially nude women. On January 23, 1985, Robinson met with Owens, Turner and Chief Shop Steward Quentin McMillan ("McMillan") to complain about the pictures. In route to Owens' office for the meeting, Robinson observed several pictures on the wall and a lewd comment was directed at the woman escorting Robinson to the office. Robinson told the men at this meeting that she felt the pictures were degrading and humiliating to her, that they nauseated her, and that she wanted them removed. She complained about the "Men Only" sign and told the men that the sign and pornography constituted discrimination, promoted harassment, and were harassment.

104. Owens told Robinson that the company had no policy against the pictures, which had been posted throughout the shipyards for at least nineteen years. 6 T.T. at 125; 1 T.T. at 59. Owens asserted that the nudity on television was as bad as the pictures at JSI, and she should look the other way just as she would turn off the television if she were offended. 6 T.T. at 142–43. He told her that she chose the JSI work environment and that the men had "constitutional rights" to post the pictures. *Id.* at 126. He would not order the removal of the pictures. He told Robinson she had no business going into the shipfitters' trailer, but he would have the sign removed because JSI had "lady shipfitters." *Id.* at 125. Owens made it clear to Robinson that the shipyards were a man's world and that the rules against vulgar and abusive language did not apply to the "cussing" commonly heard there. 1 T.T. at 59–60. She asserted, in response to a question, that she been verbally harassed more often than she could count, *id.* at 60, but his definition of sexual harassment did not admit her complaint into its scope, *see* 6 T.T. at 148–50 (Owens' definition of sexual harassment).

105. Owens did not investigate the details of Robinson's complaints. He directed that the "Men Only" sign be painted over, but he did not initiate any investigation to determine who perpetrated the deed. 6 T.T. at 153. He did not take any opportunity to view the calendar about which Robinson complained. *Id.* at 151. He told the Mayport Yard foremen at a meeting shortly thereafter that pictures showing sexual intercourse should be removed, but pictures of nude or partially nude women could remain. *Id.* at 146–48. He specifically directed the foremen to leave up vendors' advertising calendars such as Joint Exhibits Nos. 1 through 5, some of which he had observed in various locations in the backyard compound after Robinson's complaint to him. *Id.* at 146–47.

106. Robinson next took her complaint to Ahlwardt, Owens' superior at the Mayport Yard. On January 23, 1985, Robinson called Ahlwardt and told him of her complaints to Owens regarding the pictures and the "Men Only" sign. Robinson testified that after she explained the course of events involving her complaint to Owens and her desire to have the pictures removed, Ahlwardt stated that he would not order the pictures removed. 1 T.T. at 65. Defendants initially admitted Robinson's version of Ahlwardt's reaction but Ahlwardt denied at trial that he had told Robinson that he would refuse to remove the pictures, 6 T.T. at 194. The admission is binding and the Court credits Robinson's description of Ahlwardt's reaction. Ahlwardt, however, agreed to meet with Robinson to discuss her complaints.

107. Prior to meeting with Robinson, Ahlwardt made several phone calls. He contacted supervisors at the Commercial Yard to determine whether the pictures to which Robinson objected were present there also. Earl Day, a machinery superintendent at the Commercial Yard, confirmed that pictures of nude or partially nude women were on display in that workplace. Ahlwardt Depo. at 114–16. Ahlwardt learned from Harry Wingate, a hull superintendent at the Commercial Yard, that such pictures were "all over the place" there.

108. Ahlwardt also spoke to two persons in policymaking positions. He called Stewart to discuss whether JSI had a policy forbidding the posting of pictures such as those about which Robinson complained. He told Stewart that a "breast shot" was at issue. Stewart told Ahlwardt that no policy prohibited such pictures, that Robinson's complaint was baseless, and that the calendars and pictures should be left alone. 6 T.T. at 164–65. Thereafter Ahlwardt spoke to Brown. Brown likewise expressed his opinion that the materials should not be removed and that Robinson's complaint lacked merit. Brown specifically instructed Ahlwardt that an order prohibiting the display of pictures of nude and partially nude women should not be issued. 6 T.T. at 201–02. Neither Stewart nor Brown conducted any investigation of Robinson's complaint prior to rendering advice to Ahlwardt.

109. Following these phone calls, Ahlwardt met with Robinson. Also present at this meeting were Turner, McMillan, and Barbara Dingle, a union secretary who worked as a mechanic. Robinson did not ask for the presence of union representatives; those individuals appeared at Ahlwardt's request. Robinson initiated the conversation by requesting the removal of the offending pictures and calendars. She explained her position, including her representation that other women at JSI took offense at the presence of the pictures. Ahlwardt replied that he did not know of any "pornographic" pictures in any offices or shops at the Mayport Yard; his definition of pornography is limited to pictures depicting intercourse, masturbation, or other sexual activity. 6 T.T. at 206. Robinson pressed her point by referring to the company rule against obscenity; Ahlwardt belittled her concern by looking up the term in a dictionary and dismissing it as vague. 1 T.T. at 69. Ahlwardt further told Robinson that nautical people always had displayed pinups and other images of nude or partially nude women, like figureheads on boats, and that the posting of such pictures was a "natural thing" in a nautical workplace. Ahlwardt opined that there was nothing wrong with pinups in the shipyards, that he himself previously had posted such pictures, 1 T.T. at 69, and that they certainly were not intended to intimidate, embarrass or cause concern for anyone, 6 T.T. at 173. Robinson attempted to raise a comparison between the effect of pornography on women and the effect of Ku Klux Klan propaganda on black people, 1 T.T. at 69–70, but Ahlwardt dismissed this comparison with the retort that there were Klan members working in the shipyards, *id.* at 70; 6 T.T. at 175. The focus of the meeting then shifted to an inquiry whether Robinson had been physically assaulted or sexually propositioned in the course of her work. 2 T.T. at 134–36. Robinson stated she had not been harassed in those manners, but she considered the pictures to be harassment and to promote harassment. *Id.* at 135; 6 T.T. at 169.

110. Ahlwardt complimented Robinson on her high morals. 1 T.T. at 71. He then asked Dingle if she took offense at the pictures, to which Dingle answered that she did not. 6 T.T. at 172. Dingle suggested that Robinson was spending too much time attending to the pictures and not enough time attending to her job. *Id.;* McMillan Depo. at 101. McMillan asserted that the shipyards were "a man's world" and therefore men are going to post pinups. McMillan Depo. at 98–99.

111. Turner was first to leave the meeting. He stated the problem was taken care of because he was transferring Robinson to the Commercial Yard. 1 T.T. at 73. Robinson left thereafter, visibly upset from the encounter. 3 T.T. at 91–92; McMillan Depo. at 110–11; *see* 1 T.T. at 79 (Robinson's testimony of how upset she was). Robinson received the transfer downtown.

112. Following the meeting with Robinson, Ahlwardt instructed Owens not to issue any prohibition of pictures of nude and partially nude women in the workplace. Ahlwardt took no action of his own to remove any pictures, although he visited the shipfitters' trailer the next day, when he was scheduled to be aboard the *U.S.S. Saratoga,* to observe the Whilden Valve calendar. 6 T.T. at 176–77.

113. Robinson testified that she filed a union grievance about the pictures and the

"Men Only" sign. 1 T.T. at 78. She further testified that the third-shift shop steward told her that the grievance was pulled—withdrawn by the union leadership. *Id.* at 80. The vice-president of the union at that time, Leroy Yeomans, testified that, to his knowledge, no such grievance was filed or pulled. 6 T.T. at 224. The Court credits the testimony of Robinson. An account of the events at issue drafted by her contemporaneously with the incident, *see* Jt.Exh. No. 10, at 18–19, is consistent with her testimony and it was written at a time and for a purpose that do not suggest a motive for fabrication.

114. The Court further finds that use of the grievance procedure would have been futile for Robinson. The chief steward at the Mayport Yard, McMillan, considered the pictures to be acceptable; indeed, he recounted his statement to Owens that he would grieve any rule banning the pictures as an infringement on the freedom of expression of male shipyard workers. McMillan Depo. at 99. Further, since the offensive pictures originated in the conduct of the majority of the bargaining unit members, it is unrealistic to expect the union to press for sanctions. Moreover, the supervisory personnel who would rule on the various steps of the grievance, Lovett, Owens, and Stewart, clearly expressed their unwillingness to take action against the posting of sexually-oriented pictures in the shipyards.

115. Robinson filed her complaint with the Jacksonville Equal Opportunity Commission ("JEOC"), an authorized state referral agency. Jt.Exh. No. 9. A wide range of behavior was alleged in her complaint, including exposure to the above-described pictures, exposure to sexually suggestive and humiliating comments, and the "Men Only" sign. Robert Kimbrough from JEOC visited JSI, spoke with Ahlwardt, Owens, and Stewart, and conducted a walk-through in some areas of the shipyard to observe the pictures in those places. 8 T.T. at 170–72, 197–98. Robinson subsequently received a right to sue letter from the Equal Employment Opportunity Commission, together with a determination that no reasonable cause existed to believe that "she was discriminated against ... by being subjected to sexually explicit pornography and harassment because of her sex, female." D.Exh. No. 6. The Court places little weight on this "no cause" determination because the investigation apparently was cursory and the only decided case relevant to this issue at that time, *Rabidue v. Osceola Refining Corp.*, 805 F.2d 611 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), may have provided the misleading impression that Robinson had not raised an actionable claim.

116. On September 2, 1986, within ninety days of her receipt of the right to sue letter, Robinson filed the present lawsuit. The parties and claims were adjusted in the second amended complaint filed herein on May 6, 1987.

*1987 Sexual Harassment Policy*

117. In April 1987, during the pendency of this lawsuit, JSI adopted a new sexual harassment policy. It was instituted unilaterally, without consulting or bargaining with the union. *See* McMillan Depo. at 118–19. The official policy statement, signed by Vice–President for Operations Larry Brown, endorses the following policy:

1. It is illegal and a violation of Jacksonville Shipyards, Inc., Policy for any employee, male or female, to sexually harass another employee by

   a. making unwelcomed sexual advances or request for sexual favors or other verbal or physical conduct of a sexual nature, a condition of an employee's continued employment, or

   b. making submission to or rejection of such conduct the basis for employment decisions affecting the employee, or

   c. creating an intimidating, hostile, or offensive working environment by such conduct.

2. Any employee who believes he or she has been the subject of sexual harassment, should report the alleged act immediately to *John Stewart Ext. 3716* in our Industrial Rela-

tions Department. An investigation of all complaints will be undertaken immediately. Any supervisor, agent or other employee who has been found by the Company to have sexually harassed another employee will be subject to appropriate sanctions, depending on the circumstances, from a warning in his or her file up to and including termination.

D.Exh. No. 10. This policy is virtually verbatim a model policy distributed by JSI's parent corporation. P.Exh. No. 55. The model policy was part of an industrial relations newsletter which contained an article on sexual harassment. Stewart read this newsletter in the normal course of his job. 8 T.T. at 195. The article on sexual harassment, authored by the manager of employee services at the corporate headquarters, stated that among the "conditions or items in the work environment" that an employee may find offensive on the basis of the employee's sex are " 'subtle' forms of harassment like: dirty jokes, sexually offensive pictures, leers or glares, sexual innuendoes, wolf whistles or cat calls, etc." P.Exh. No. 55, at 5. The article further cautioned that coworkers and peers might create the hostile work environment. The article observed that the problem of whether offensive conduct is "unwelcome" cannot be determined from an offended employee's failure to complain because the employee might not know how to react, or where to seek help, so the offending employees may continue the behavior under the mistaken impression that it is welcome. The article referenced the model policy and its inclusion of the author's name and telephone number as an alternative avenue for complaints where an employee feels unable to complain to the industrial relations department representative. JSI's policy did not include any alternate person to receive complaints. A final point made by the article was that the standard for conduct had to come from the top. "Our defense is stronger if the pictures are not there at all than to argue that they are in an area where the employee shouldn't have been. Rather than asking if the employee would be offended by the joke, don't tell it at all." *Id.* JSI's policy did not incorporate this advice.

118. The new policy was distributed solely through posting on the bulletin boards in the shops and the general bulletin boards. 8 T.T. at 174–75. It was not incorporated into the General Safety Instruction and Company Rule Book, the contract book, the affirmative action plan, or on the EEO posters. *Id.* at 189.

119. The 1987 policy had little or no impact on the sexually hostile work environment at JSI. Employees and supervisors lacked knowledge and training in the scope of those acts that might constitute sexual harassment. For example, Henry Starling, night shift superintendent at Commercial Yard, testified that he received no training and that he had no idea what is meant by the phrase sexual harassment, 7 T.T. at 34–35, and John Nicholas, assistant foreman in welding shop at Commercial Yard, also testified that he lacked instruction concerning sexual harassment, *id.* at 233–34. The pictures of nude and partially nude women remained posted throughout the workplace. In fact, in January 1988, after the issuance of the new policy, Stewart objected strongly when O.C. McBride, a superintendent at the Mayport Yard, removed three *Playboy-* and *Penthouse*-style calendar pictures from the shipfitters' shop and the electrical shop in anticipation of a tour of the shipyards conducted by Stewart. 7 T.T. at 53–60. The naming of only one company representative, Stewart, to hear sexual harassment complaints diminished the policy's value to an employee, such as Robinson, whose prior experiences with Stewart left her without confidence in his willingness to handle such complaints. 1 T.T. at 137.

120. The Court finds that the policies and procedures at JSI for responding to complaints of sexual harassment are inadequate. The company has done an inadequate job of communicating with employees and supervisors regarding the nature and scope of sexually harassing behavior. This failure is compounded by a pattern of unsympathetic response to complaints by employees who perceive that they are vic-

tims of harassment. This pattern includes an unwillingness to believe the accusations, an unwillingness to take prompt and stern remedial action against admitted harassers, and an express condonation of behavior that is and encourages sexually harassing conduct (such as the posting of pictures of nude and partially nude women). In some instances, the process of registering a complaint about sexual harassment became a second episode of harassment.

### Remedial Aspects

121. Plaintiff seeks injunctive relief to force JSI to implement a comprehensive, effective and enforced sexual harassment policy. She also seeks make-whole relief for financial loss she alleges she suffered due to the harassing work environment. The components of this loss include days of absenteeism taken to recover from or to avoid the work environment, foregone opportunities for overtime and holiday pay, and passed opportunities for advancement through certain welding certification tests. She additionally seeks expungement of warnings she has received for excessive absenteeism.

122. Ms. Wagner, plaintiff's expert whose expertise on education and training to combat sexual harassment was accepted without objection, testified regarding the elements of a comprehensive, effective sexual harassment policy. *See* 4 T.T. at 115–24. In her experience and according to the research conducted in this field, sexual harassment can be eliminated through a program that trains key supervisors how to investigate sexual harassment complaints, that teaches male and female employees what conduct is prohibited, and that includes a strong policy statement signed by a top-ranking company executive. The training of key supervisors in investigatory techniques encourages active monitoring of the environment and relieves some barriers to reporting of sexual harassment by placing the burden on management. The policy statement should: (1) describe with specificity the behaviors that constitute sexual harassment; (2) advise employees that sexual harassment may result from the behavior of coworkers as well as the behavior of supervisors; (3) promise and provide confidentiality and protection from retaliation for complainants and witnesses; and (4) provide a number of avenues through which a complaint may be initiated. The policy statement must receive wide, effective distribution.

123. Plaintiff proposed a remedial sexual harassment policy in her pretrial briefs. Ms. Wagner examined this policy and concluded that it contains all of the important features of an effective policy implementation procedure and training program. 4 T.T. at 126.

124. The Court finds that the evidence fully supports the appropriateness of injunctive relief in the nature of that requested by Robinson. Because defendants have not provided detailed comment on the proposed policy, the Court will permit a brief period of time for the parties to consult regarding any modification that they may deem appropriate to secure maximum success of the policy and the procedures at JSI and for defendants to register with the Court any objections to the policy that concern JSI's ability to implement the policy in a fashion consistent with the remedial goals expressed herein.

125. Regarding lost days of work, Robinson testified that she missed several days each year because she could not face entering the hostile work environment. 1 T.T. at 156–57. She did not identify this as the reason for her absenteeism when providing her reason to her employer because it did not fit into the acceptable categories for absence. *Id.* at 158. In one instance, she told her employer that she needed a leave of absence for thirty days in order to tend to a sick relative; she testified at trial that her reported reason was false and her real reason for the absence was work environment anxiety. 3 T.T. at 3. In December 1988, Robinson received a call to work the day shift at the Mayport Yard. She did not feel safe or comfortable working that shift because most of the defendants work at that time. Her anxiety caused her to have difficulty sleeping and to miss two days of work. 2 T.T. at 38–40.

126. Robinson estimated her total lost time attributable to her inability to cope with the hostile work environment. She

estimated six days lost in 1983 (at a rate of pay ranging from $9.50 to $10.50 per hour), twenty-eight days lost in 1984 (at $10.00 to $10.50 per hour), fifty days lost in 1985 (at $10.50 to $11.00 per hour), twenty-six days in 1986 (at $11.00 to $11.10 per hour), twenty-two days in 1987 (at the same rate), and thirty days in 1988 (at $10.50 to $11.00 per hour). Based on an eight hour day and lower rate of pay in each year, her estimated loss pay totals $13,640. She further estimated that she missed six holiday days between 1983 through 1988, which translates to a loss of triple the standard rate of pay for an eight hour day. 1 T.T. at 159–60. Her estimate for lost overtime earnings, which pays time and a half for Monday through Saturday and double time for Sunday, is fifteen days per year for the period. *Id.* at 158–59. She elected not to take certain welding certification tests because they would have made her more useful at the Mayport Yard, the work environment she sought most to avoid. *Id.* at 138–39. While Robinson's annual salary from JSI averaged approximately $11,000 to $12,000 over the last few years, 2 T.T. at 29–30, a male first-class welder with less seniority, Gene Joazil, earned an average of approximately $19,000 to $20,000 from 1984 through 1987 because he worked overtime. 6 T.T. at 4–7. Although Robinson worked as a massage therapist when she did not work at JSI, she testified that the job always supplemented her JSI work and did not conflict with the opportunities she lost.

127. Robinson's estimate of days missed are an admitted approximation. She explained that she could not give the dates of these days missed and that the business records that she reviewed contained errors. 1 T.T. at 139–41; 3 T.T. at 4. Defendants objected at trial to Robinson's testimony estimating the number of days missed because she did not provide the precise dates when requested to do so in a supplemental interrogatory; she had pro-

vided only the number of days estimate upon which she relied at trial.[5] Robinson unsuccessfully sought business records that might have provided her with more detail from which to draw precise dates. Her lack of success in procuring this information is wholly attributable to her failure to seek to compel compliance with her discovery request within the time permitted by the Amended Docket Control Order, entered April 6, 1987. This Court affirmed the Magistrate's ruling that plaintiff failed to show excusable neglect for her dilatory efforts. *See* Order entered January 26, 1988, at 5–6. Plaintiff reasserted her desire to discover this evidence in her pretrial brief and the Court again refused to grant a unilateral exception to the deadlines in this case under the circumstances. The Court cannot now reward plaintiff's failure to conduct discovery within the deadlines by shifting the burden to the defendants to disprove Robinson's vague estimates of time lost. Robinson made and kept notes of various events throughout the course of her struggle to get JSI to recognize the sexually harassing nature of the pictures of nude and partially nude women. Her asserted inability to identify more precisely the dates at issue lacks credibility in this light. If her estimate of the number of days is based on something more than a guess, then she should be able to identify the dates with a greater degree of specificity. It is not unreasonable, under the circumstances of this case, to require more precision in her identification of time lost. Moreover, the standard for evaluating her claim for compensation for lost time requires that she show that conditions rose to or existed at a level equivalent to an intermittent constructive discharge. *See* 118 F.R.D. at 531. Defendants require a list of the specific dates on which plaintiff was absent in order to determine if the degree of harassment in the workplace on those dates rises to the level of this higher standard; plaintiff's failure to provide specific

---

5. Plaintiff's answer to the relevant question in defendants' first interrogatories, D.Exh. No. 27, at 9 (answer to question 7), specifically identifies 12 days in the time period March 3, 1986 through August 29, 1986. Using the lower hourly rate for this period, her stated loss is $1,056. This cannot form the basis of an award, how-

ever, for two reasons. First, it is incomplete and therefore would be no more than the equivalent of nominal damages. Second, plaintiff did not come forward with the additional quantum of proof necessary to adduce whether the equivalent of a constructive discharge existed for those dates or the broader time period.

dates unfairly deprives defendants of the opportunity to argue that the work environment may be sufficiently hostile to create liability under Title VII without being sufficiently hostile to warrant plaintiff's absence from the job. The specific dates also would provide a basis for defendants to rebut Robinson's assertion that her massage therapist work did not conflict with her work at JSI; the lost overtime asserted may well have fallen on days when Robinson earned money as a massage therapist during the hours for which overtime was available.

128. The Court finds that Robinson's testimony on the financial loss alleged to flow from her missed opportunities and days off is insufficient to form a basis to calculate an entitlement to make-whole monetary relief. Likewise, the vagueness of the testimony relating to absences is an insufficient basis upon which to expunge warnings concerning absenteeism.

## CONCLUSIONS OF LAW

### Title VII

1. Jurisdiction and venue are proper in this Court.

■ 2. Robinson is an employee within the definition of 42 U.S.C. § 2000e(f). JSI is an employer within the definition of 42 U.S.C. § 2000e(b). McIlwain, Brown, Stewart, Ahlwardt, Owens and Lovett are agents of JSI and are therefore employers within the meaning of 42 U.S.C. § 2000e(b).

■ 3. Kiedrowski's status poses a difficult and contested issue. He is an employer only if he is an agent of JSI, but "[n]owhere in Title VII is the term 'agent' defined." *Barger v. Kansas*, 630 F.Supp. 88, 89 (D.Kan.1985). The most widely used definition construes the term "to be a supervisory or managerial employee to whom employment decisions have been delegated by the employer." *York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir.1982). Kiedrowski has held the positions of leaderman and quarterman, neither of which falls within the formal management structure at JSI. Moreover, he does not possess authority to place disci-

pline reports in another employee's personnel file (although he may in some instances recommend that disciplinary action be taken), he does not play any role for the company in the grievance procedure, and he does not make personnel changes in his department. *Cf. Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1515 (11th Cir.1989) (finding these factors persuasive in imposing direct liability under Title VII). The lesson of *Vance*, however, is "an agency standard which looks solely to the degree of authority the harasser wields over the plaintiff is not particularly useful in a hostile environment case such as this." *Id.* Instead, the direct authority question forms but one factor; it is necessary to "examine any evidence bearing on the overall structure of the workplace, including the relative positions of the parties involved." *Id.* Analyzed at this level, Kiedrowski's status becomes more problematic. Kiedrowski has a role in the work assignments, traditionally a significant factor leading to a finding of employer status. *See, e.g., Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *modified on other grounds*, 900 F.2d 27, 28 (4th Cir. 1990) (en banc); *Hamilton v. Rodgers*, 791 F.2d 439, 442–43 (5th Cir.1986). Further, quartermen and leadermen sometimes exercise apparent authority by acting to resolve disputes between employees, including disputes that have arisen because of sexually harassing behavior. Employees recognize this difference in apparent authority by approaching them for assistance. These facts somewhat weigh in favor of assigning employer status to Kiedrowski. *Cf. Mason v. Twenty-Sixth Judicial Dist. of Kan.*, 670 F.Supp. 1528, 1532 (D.Kan. 1987) (employees could be held as Title VII employers where they were "given authority to rate the plaintiff in her performance, and also to control work assignments and other conditions of employment"). The absence of a formal delegation in all instances and the exclusion of quartermen and leadermen from the formal supervisory structure, however, place the relative positions of the parties more closely to that of coworkers than that of employer and subordinate.[6] The limitations on the authority

---

6. These limitations do not diminish the signifi-

cance of quartermen and leadermen in the con-

of quartermen and leadermen persuade the Court in the final balance to conclude that the role filled by quartermen and leadermen is not that of an employer and therefore the imposition of employer liability on Kiedrowski is inappropriate.

■ 4. Five elements comprise a claim of sexual discrimination based on the existence of a hostile work environment: (1) plaintiff belongs to a protected category; (2) plaintiff was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a term, condition or privilege of employment; and (5) *respondeat superior*, that is, defendants knew or should have known of the harassment and failed to take prompt, effective remedial action.[7] *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66–69, 106 S.Ct. 2399, 2405–07, 91 L.Ed.2d 49 (1986); *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982); *Robinson v. Jacksonville Shipyards, Inc.*, 118 F.R.D. 525, 527–28 (M.D.Fla.1988).

■ 5. Robinson indisputably belongs to a protected category.

■ 6. The threshold for determining that sexually harassing conduct is unwelcome is "that the employee did not solicit or incite it, and ... that the employee regarded the conduct as undesirable or offensive." *Henson*, 682 F.2d at 903 (citations omitted).

7. The relevant conduct in this case is the posting of pictures of nude and partially nude women in the workplace, the sexually demeaning remarks and jokes made by male workers, and harassment lacking a sexually explicit content such as the "Men Only" sign. The credible testimony of Robinson, corroborated by the observations of her supervisors and coworkers, attests to the offense she took at this behavior. *Cf. Vinson*, 477 U.S. at 68, 106 S.Ct. at

2406 ("the question whether particular conduct was indeed unwelcome presents difficult credibility determinations committed to the trier of fact"). Moreover, not a scintilla of evidence suggests that she solicited or incited the conduct. Robinson did not welcome the conduct of which she complains.

■ 8. The third element imposes a requirement that Robinson "must show that but for the fact of her sex, she would not have been the object of harassment." *Henson*, 682 F.2d at 904. This causation requirement encompasses several claims. For example, harassing behavior lacking a sexually explicit content but directed at women and motivated by animus against women satisfies this requirement. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990) ("The offensive conduct is not necessarily required to include sexual overtones in every instance."); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 905 (1st Cir.1988); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir. 1988) ("Intimidation and hostility toward women because they are women can obviously result from conduct other than sexual advances."); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987); *McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C.Cir.1985). Second, sexual behavior directed at women will raise the inference that the harassment is based on their sex. *E.g., Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904–05 (11th Cir.1988); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1561 (11th Cir.1987); *see Andrews*, 895 F.2d at 1485; *Lipsett*, 864 F.2d at 905; *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir.1988), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989). A third category of actionable conduct is behavior that is not directed at a particular individual or group of individuals, but is disproportionately

trol of sexually harassing behavior, nor do they diminish the reasonableness of the belief of female employees that reporting sexually harassing behavior to quartermen and leadermen constituted an appropriate course of action to secure remedy thereof.

7. Although this fifth element bears the label "respondeat superior," it actually embraces a

negligence standard for employer liability that essentially restates the "fellow servant" rule. *See, e.g., Hirschfield v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 n. 5 (10th Cir.1990); *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1015 (8th Cir.1988).

more offensive or demeaning to one sex. *See Henson*, 682 F.2d at 904; *see also Andrews*, 895 F.2d at 1485–86; *Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir.1989), *rev'g* 47 Fair Empl.Prac. Cas. (BNA) 671 (W.D.La.1987); *Lipsett*, 864 F.2d at 905; *Rabidue v. Osceola Ref. Corp.*, 805 F.2d 611, 627 (6th Cir.1986) (Keith, J., dissenting), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). This third category describes behavior that creates a barrier to the progress of women in the workplace because it conveys the message that they do not belong, that they are welcome in the workplace only if they will subvert their identities to the sexual stereotypes prevalent in that environment. That Title VII outlaws such conduct is beyond peradventure. *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 249–51, 109 S.Ct. 1775, 1790–91, 104 L.Ed.2d 268 (1989) (plurality opinion); *id.* at 262–67, 109 S.Ct. at 1797–99, 104 L.Ed.2d 268 (O'Connor, J., concurring in judgment) (use of gender stereotypes to evaluate female employees violates Title VII); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (Title VII was passed to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of ... [an] impermissible classification").

9. The harassment of which Robinson complains was based upon her sex. The Findings of Fact reflect examples of the three aforementioned types of behavior. She suffered nonsexual harassing behavior from coworkers such as George Leach, who verbally abused or shunned her because she is a female. The "Men Only" sign also illustrates this type of harassment. She suffered incidents of directed sexual behavior both before and after she lodged her complaints about the pictures of nude and partially nude women. The pictures themselves fall into the third category, behavior that did not originate with the intent of offending women in the workplace (because no women worked in the jobs when the behavior began) but clearly has a disproportionately demeaning impact on the women now working at JSI. The expert testimony of Dr. Fiske provides solid evidence that the presence of the pictures, even if not directed at offending a particular female employee, sexualizes the work environment to the detriment of all female employees.

■ 10. The fourth element tests the impact of the harassing behavior on the employee and the work environment, separating the "mere utterance of ... [a discriminatory] epithet which engenders offensive feelings in an employee," *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), and "the petty slights suffered by the hypersensitive," *Zabkowicz v. West Bend Co.*, 589 F.Supp. 780, 784 (E.D.Wis.1984), from actionable conduct under Title VII. To affect a "term, condition, or privilege" of employment within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson*, 682 F.2d at 904). "This test may be satisfied by a showing that the sexual harassment was sufficiently severe or persistent 'to affect seriously [the victim's] psychological well being.'" *Sparks*, 830 F.2d at 1561 (quoting *Henson*, 682 F.2d at 904). This "is a question to be determined with regard to the totality of the circumstances." *Henson*, 682 F.2d at 904. In the context of a racial harassment case, which is governed by the same standards under Title VII as a sexual harassment case, *see Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 485 (6th Cir. 1989), the Eleventh Circuit elaborated on the evaluation of the totality of the circumstances:

> The prima facie showing in a hostile work environment case is likely to consist of evidence of many or very few acts or statements by the defendant which, taken together, constitute harassment. It is important to recognize that in assessing the credibility and weight of the evidence presented, the [trier of fact] does not necessarily examine each al-

leged incident of harassment in the vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.

. . . .

... A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits.... [T]he totality of the circumstances necessarily includes the severity, as well as the number, of incidents of harassment.

*Vance,* 863 F.2d at 1510–11 (footnote omitted).

11. Element four must be tested both subjectively and objectively. Regarding the former, the question is whether Robinson has shown she is an "affected individual," that is, she is at least as affected as the reasonable person under like circumstances. *See Robinson,* 118 F.R.D. at 530. The evidence reflects the great upset that Robinson felt when confronted with individual episodes of harassment and the workplace as a whole. Further, the impact on her work performance is plain. For essentially the same reasons that she successfully proved her case on the second element of this cause of action, Robinson likewise carries her burden as to the subjective part of the fourth element. (Defendants, having urged throughout these proceedings that Robinson is hypersensitive, appear to concede the point.) The contested issue in this case is the objective evaluation of the work environment at JSI.

■ 12. The objective standard asks whether a reasonable person of Robinson's sex, that is, a reasonable woman, would perceive that an abusive working environment has been created. *See Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405; *Andrews,* 895 F.2d at 1482; *Brooms v. Regal Tube Co.,* 881 F.2d 412, 419–20 (7th Cir.1989). The severity and pervasiveness aspects form a structure to test this hypothesis. As the prior quotations illustrate, the contours of what comprises "severe" and "pervasive" are not defined with precision. An interaction between the two is plain; greater severity in the impact of harassing behavior requires a lesser degree of pervasiveness in order to reach a level at which Title VII liability attaches. *E.g., Carrero v. New York Hous. Auth.,* 890 F.2d 569, 577 (2d Cir.1989). Moreover, the analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes. "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." *Andrews,* 895 F.2d at 1484. It follows naturally from this proposition that the environment viewed as a whole may satisfy the legal definition of an abusive working environment although no single episode crosses the Title VII threshold.

13. The objective evaluation must account for the salient conditions of the work environment, such as the rarity of women in the relevant work areas. This important qualification explains why the Court places little value on the expert testimony of Drs. Mosher and Scott regarding the level of offensiveness to women of pornographic materials as measured in the abstract. Correspondingly, the need to identify the context in which harassing conduct arises weighs heavily in the Court's acceptance of the expert opinions of Dr. Fiske and Ms. Wagner.

14. A reasonable woman would find that the working environment at JSI was abusive. This conclusion reaches the totality of the circumstances, including the sexual remarks, the sexual jokes, the sexually-oriented pictures of women, and the non-sexual rejection of women by coworkers. The testimony by Dr. Fiske and Ms. Wagner provides a reliable basis upon which to conclude that the cumulative, corrosive effect of this work environment over time affects the psychological well-being of a reasonable woman placed in these condi-

tions. This corollary conclusion holds true whether the concept of psychological well-being is measured by the impact of the work environment on a reasonable woman's work performance or more broadly by the impact of the stress inflicted on her by the continuing presence of the harassing behavior. The fact that some female employees did not complain of the work environment or find some behaviors objectionable does not affect this conclusion concerning the objective offensiveness of the work environment as a whole. *See Priest v. Rotary*, 634 F.Supp. 571, 582 (N.D.Cal. 1986); *Morgan v. Hertz Corp.*, 542 F.Supp. 123, 128 (W.D.Tenn.1981), *aff'd*, 725 F.2d 1070 (6th Cir.1984).

15. The Court recognizes the existence of authority supporting defendants' contention that sexually-oriented pictures and sexual remarks standing alone cannot form the basis for Title VII liability. The Court concludes that the reasoning of these cases is not consistent with Eleventh Circuit precedent and is otherwise unsound.

(a) Defendants' authority, which hails from other jurisdictions, proceeds from premises that are inconsistent with authority that is binding on this Court. For example, the Sixth Circuit in *Rabidue* quoted with approval the conclusion of the district court that

> it cannot seriously be disputed that in some work environments, humor and language are rough hewn and vulgar. Sexual jokes, sexual conversations and girlie magazines may abound. Title VII was not meant to—or can—change this. It must never be forgotten that Title VII is the federal court mainstay in the struggle for equal employment opportunity for the female workers of America. But it is quite different to claim that Title VII was designed to bring about a magical transformation in the social mores of American workers.

805 F.2d at 620–21 (quoting in full 584 F.Supp. 419, 430).[8] This conclusion but-tressed the appellate court's belief that "a proper assessment or evaluation of an employment environment" in a sexual harassment suit includes "the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectation of the plaintiff upon voluntarily entering that environment." *Id.* at 620. The *Rabidue* court further expounded on the social context argument:

> The sexually oriented poster displays had a de minimis effect on the plaintiff's work environment when considered in the context of a society that condones and publicly features and commercially exploits open displays of written and pictorial erotica at the newsstands, on prime-time television, at the cinema, and in other public places.

*Id.* at 622. These propositions, however, cannot be squared with the Eleventh Circuit's holding in *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 & n. 2 (11th Cir.1982), that the social milieu of the area and the workplace does not diminish the harassing impact of racial slurs. (As previously noted, the analysis is not different for racial and sexual harassment claims.) The point is made more directly for sexual harassment claims in *Sparks*, wherein the appellate court explained that often "the whole point of the sexual harassment claim" is that behavior that "may be permissible in some settings ... can be abusive in the workplace...." 830 F.2d at 1561 n. 13; *see also Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1275 n. 11 (5th Cir.1989) ("heavy pollution defense" inconsistent with *Vinson* and *Henson*). A district court within the Eleventh Circuit recently concluded that a sexually hostile work environment was created in a police department when male officers subjected a female patrol officer to verbal abuse, "a plethora of sexually offensive posters, pictures, graffiti, and

---

**8.** The Sixth Circuit subsequently explained that this passage should be read with "emphasis on the word 'magical,' not the word 'transformation.' Title VII was not intended to eliminate all private prejudice and biases. The law, however, did alter the dynamics of the workplace because it operates to prevent bigots from harassing their co-workers." *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 350 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989).

pinups placed on the walls throughout the Police Department," and "innumerable childish, yet offensive sexual and obscene innuendoes and incidents aimed at her on the basis of sex." *Sanchez v. City of Miami Beach,* 720 F.Supp. 974, 977 (S.D. Fla.1989).

(b) The "social context" argument also lacks a sound analytical basis. Professor Kathryn Abrams has written an insightful critique of this argument:

> The *Rabidue* court's proposed standard is wholly inappropriate for several reasons. Not only did the court overestimate the public consensus on the question of pornography, but the fact that many forms of objectionable speech and conduct may be protected against interference by public authorities in the world at large does not mean that pornography should be accepted as appropriate in the workplace. Pornography in the workplace may be far more threatening to women workers than it is to the world at large. Outside the workplace, pornography can be protested or substantially avoided—options that may not be available to women disinclined to challenge their employers or obliged to enter certain offices. Moreover, while publicly disseminated pornography may influence all viewers, it remains the expression of the editors of *Penthouse* or *Hustler* or the directors of *Deep Throat.* On the wall of an office, it becomes the expression of a coworker or supervisor as well.

> In this context the effect of pornography on workplace equality is obvious. Pornography on an employer's wall or desk communicates a message about the way he views women, a view strikingly at odds with the way women wish to be viewed in the workplace. Depending upon the material in question, it may communicate that women should be the objects of sexual aggression, that they are submissive slaves to male desires, or that their most salient and desirable attributes are sexual. Any of these images may communicate to male coworkers that it is acceptable to view women in a predominately sexual way. All of the views to some extent detract from the image most women in the workplace

would like to project: that of the professional, credible coworker.

Abrams, *Gender Discrimination and the Transformation of Workplace Norms,* 42 Van.L.Rev. 1183, 1212 n. 118 (1989) (citation omitted); *accord Andrews,* 895 F.2d at 1485–86; *Lipsett,* 864 F.2d at 905 (adopting analysis of dissent in *Rabidue* ); *Bennett,* 845 F.2d at 106; *Barbetta v. Chemlawn Servs. Corp.,* 669 F.Supp. 569, 573 & n. 2 (W.D.N.Y.1987); Ehrenreich, *Pluralist Myths and Powerless Men: The Ideology of Reasonableness in Sexual Harassment Law,* 99 Yale L.J. 1177, 1201–10 (1990); Strauss, *Sexist Speech in the Workplace,* 25 Harv. C.R.–C.L.L. Rev. 1, 11–16 (1990). Professor Catherine MacKinnon makes the point in a pithy statement: "If the pervasiveness of an abuse makes it nonactionable, no inequality sufficiently institutionalized to merit a law against it would be actionable." C. MacKinnon, Feminism Unmodified 115 (1987).

(c) The "social context" argument cannot be squared with Title VII's promise to open the workplace to women. When the pre-existing state of the work environment receives weight in evaluating its hostility to women, only those women who are willing to and can accept the level of abuse inherent in a given workplace—a place that may have historically been all male or historically excluded women intentionally—will apply to and continue to work there. It is absurd to believe that Title VII opened the doors of such places in form and closed them in substance. A pre-existing atmosphere that deters women from entering or continuing in a profession or job is no less destructive to and offensive to workplace equality than a sign declaring "Men Only." As the Fifth Circuit recently observed, "Work environments 'heavily charged' or 'heavily polluted' with racial or sexual abuse are at the core of the hostile environment theory." *Wyerick,* 887 F.2d at 1275. To implement fully the promise of Title VII, "the standards for assessing women's psychological harm due to harassment must begin to reflect women's sensitivity to behavior once condoned as acceptable." Note, *The Aftermath of Meritor: A Search for Standards in the Law of Sexu-*

*al Harassment,* 98 Yale L.J. 1717, 1737–38 (1989).

(d) The *Rabidue* analysis violates the most basic tenet of the hostile work environment cause of action, the necessity of examining the totality of the circumstances. Excluding some forms of offensive conduct as a matter of law is not consistent with the factually oriented approach dictated by *Vinson, Henson,* and their progeny. The expert testimony in this case places the many instances of offensive behavior into a context that permits evaluation of the environment as a whole. The Court cannot ignore the expert testimony, or the Court's own perception of the work environment evaluated as a whole; it would have to do so in order to adopt the *Rabidue* conclusion that a sexually charged environment has only a "de minimis effect" on the psychological well-being of a reasonable woman who works in the skilled crafts at JSI.

16. Having determined that the first four elements of a sexual harassment claim have been satisfied, the Court faces the task of assessing the liability of the employers in this case. The corporate employer, JSI, is subject only to vicarious liability, an issue more fully developed *infra.* The individual employers, however, pose a distinct liability issue.

■■■ 17. The principles of employer liability for individual corporate officers are broad. It has been described as "inconceivable that Congress intended to exclude from liability the very persons who have engaged in the employment practices which are the subject of the action." *Dague v. Riverdale Athletic Ass'n,* 99 F.R.D. 325, 327 (N.D.Ga.1983). Instead, a liberal interpretation of Title VII works to hold responsible "those who control the aspects of employment accorded protection" by that law. *Spirt v. Teachers Ins. & Annuity Ass'n,* 475 F.Supp. 1298, 1308 (S.D.N.Y. 1979), *aff'd in relevant part,* 691 F.2d 1054 (2d Cir.1982), *vacated,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), *reinstated as modified,* 735 F.2d 23 (2d Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984).

It may seem odd that an individual occupying a supervisory position could be held liable for the acts of his underlings when the employer of both can also be held liable, particularly where the supervisor had no personal involvement in the discriminatory acts of those working for him. However, placing an affirmative duty to prevent discriminatory acts on those who are charged with employment decisions appears to be consistent with the aims of Title VII.

*McAdoo v. Toll,* 591 F.Supp. 1399, 1406 (D.Md.1984). Because these principles are so broad, however, they should be applied with an eye toward finding liability only against individuals who exercise effective control in the workplace—those persons who make or contribute meaningfully to employment decisions. *See, e.g., Kolb v. Ohio,* 721 F.Supp. 885, 891 (N.D.Ohio 1989); *McAdoo,* 591 F.Supp. at 1406. Thus, lower level supervisory employees who qualify as employers should be exonerated from liability when they do no more than follow the policies established by their superiors. Individual liability attaches, if at all, to the generals, not their soldiers.

■■■ 18. McIlwain is not liable for the hostile work environment to which Robinson was subjected. He did not personally participate in any sexually harassing behavior that affected Robinson and he was not personally presented with her complaints of sexual harassment. Indeed, his status as an employer derives from his status as an agent of JSI. The responsibility for handling sexual harassment complaints was delegated to supervisory personnel below McIlwain. While Robinson suggests that this delegation creates an agency relationship between McIlwain and the supervisory personnel responsible for remedying sexual harassment, her argument does not account for the source of McIlwain's authority to delegate. The delegation is done on behalf of the corporation, within McIlwain's agency relationship with JSI, and it therefore creates an agent-principal relationship between the delegatees and JSI, not the delegatees and McIlwain. *See Brown,* 684 F.Supp. at 1085–86; *see also* Restatement (Second) of Agency

§ 5 *comment a* (1958); *id.* § 222. Accordingly, JSI, not McIlwain, incurs liability when the actions (or inactions) of the delegatees create the circumstances for the application of *respondeat superior.*

■ 19. Brown is liable for the hostile work environment to which Robinson was subjected. His responsibility extended to the creation and implementation of JSI's sexual harassment policies. Their failure is his failure. Additionally, he personally intervened in Robinson's complaint and directed that no remedial action be taken.

■ 20. Stewart is liable for the hostile work environment to which Robinson was subjected. He held responsibility for the day-to-day administration of the sexual harassment complaint machinery. Its failure is his failure. Additionally, he personally intervened in Robinson's complaint and directed that no remedial action be taken.

■ 21. Ahlwardt is not liable for the hostile work environment to which Robinson was subjected. He stood in a middle management position and did no more or less than implement the order of his superiors, albeit with little finesse or compassion.

■ 22. Owens is not liable for the hostile work environment to which Robinson was subjected. He also stood too far down on the ladder of authority to accrue individual liability for the state of the workplace.

■ 23. Lovett is not liable for the hostile work environment to which Robinson was subjected. Not only did he stand too far down on the ladder of authority, he did not exercise control directly over Robinson.

■ 24. Defendants argue that they cannot be held liable unless they personally participated in sexually offensive conduct, citing *Brown v. City of Miami Beach,* 684 F.Supp. 1081, 1085–86 (S.D.Fla. 1988), *judgment rendered sub nom. Sanchez v. City of Miami Beach,* 720 F.Supp. 974 (S.D.Fla.1989), and *Hendrix v. Fleming Cos.,* 650 F.Supp. 301, 302–03 (W.D. Okla.1986). The Court disagrees with the limiting force of defendants' proposition. Active participation in sexually harassing behavior is a sufficient but not a necessary condition to the imposition of Title VII liability.[9] An individual employer who ratifies the sexually harassing conduct of another is surely as culpable as if the employer actively participated. *See McAdoo,* 591 F.Supp. at 1406. One method of ratification is an individual employer's failure or refusal to act to remedy a valid complaint of sexual harassment presented to that individual for which the individual has a duty to respond. *See Morris v. American Nat'l Can Corp.,* 730 F.Supp. 1489, 1496–97 (E.D.Mo.1989); *Maturo v. National Graphics, Inc.,* 722 F.Supp. 916, 923–24 (D.Conn.1989).

■ 25. JSI is liable for the hostile work environment to which Robinson was subjected. Corporate defendant liability may be proved under either of two theories. Direct liability is incurred when an agent of the corporate employer is responsible for the behavior that comprises the hostile work environment and the agent's actions were taken within the scope of the agency. *See Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 n. 1 (11th Cir.1989); *Vance,* 863 F.2d at 1512. Indirect liability attaches where the hostile environment is created by one who is not the plaintiff's employer, such as a coworker, or by an agent of the employer who is acting outside the scope of the agency, and the plaintiff can establish that the employer knew or should have known of the harassment and failed to take prompt, effective

9. Plaintiff seeks to hold Ahlwardt and Lovett directly liable for their admissions that they have *posted sexually-oriented pictures in their own work areas.* No evidence adduced at trial demonstrated that these pictures formed part of the work environment to which Robinson was subjected. Indeed, it appears that their personal pin-ups appeared on and were removed from the walls before Robinson began work at JSI. Absent such proof, Ahlwardt's and Lovett's pictures cannot form the basis for direct liability to Robinson. This is not to say that those pictures are *not important as evidence of the scope of* the hostile work environment and of management's attitude toward the conditions that created the environment, for they are. Rather, the principle upheld is that an individual as an employer is held liable only for those actions taken by the individual that actually have an impact on the complaining employee.

remedial action. *See Steele,* 867 F.2d at 1316; *Vance,* 863 F.2d at 1512; *Henson,* 682 F.2d at 910. The Court concludes that Robinson has demonstrated JSI's liability under both theories.

26. Direct liability for a corporate defendant in a hostile work environment case is unusual. In *Steele,* the Eleventh Circuit described the concept as "illogical" because "[t]he supervisor does not act as the company; the supervisor acts outside 'the scope of actual or apparent authority to hire, fire, discipline, or promote.'" 867 F.2d at 1316. This proposition is true for the facts of that case, where a male supervisor made sexually offensive comments to a female employee and company policy clearly disapproved of such conduct. The agency principles involved in *Steele* apply more clearly because of the nature of the harassment. Here it must be recognized that "the legal concept [of the scope of employment] was developed for factual settings bounded by a specific authorized task, a single unauthorized act, and one-time injury. Consequently, it is difficult to draw useful analogies to the continuing injuries and complex management practices involved in sexual harassment." Note, *Employer Liability Under Title VII for Sexual Harassment After Meritor Savings Bank v. Vinson,* 87 Colum.L.Rev. 1258, 1273 (1987). It is therefore necessary to examine closely the fashion in which the agents exercised authority in this case.

(a) The policymaking agents of the corporate defendant condoned the distribution of the vendors' advertising calendars that formed part of the basis for Robinson's 1985 complaint. The work rules at JSI did not permit the posting of many kinds of materials, required permission for the posting of other kinds of materials, but did not restrict the posting of pictures of nude or partially nude women. Direct liability is apparent when an employer's policy subjects female employees to sexual harassment on the job. *See Priest,* 634 F.Supp. at 581; *EEOC v. Sage Realty Corp.,* 507 F.Supp. 599, 608–10 (S.D.N.Y.1981); *Marentette v. Michigan Host, Inc.,* 506 F.Supp. 909, 911 (E.D.Mich.1980).

(b) Brown and Stewart occupied the key positions at JSI for controlling the quality of the work environment. When faced with Robinson's complaint over sexually-oriented pictures, they did not merely fail to act to remedy the hostile environment, they affirmatively endorsed and ratified a portion of it. Moreover, the 1987 policy change presented an opportunity to begin reform of the work environment, and the materials accompanying the model policy suggested a course consistent with remedying plaintiff's complaint, but JSI declined to take these suggested steps.

(c) The aforementioned actions came within the scope of the agency relationship between JSI and its supervisors who acted as policymaking agents. *Cf. Sparks,* 830 F.2d at 1558–59 & n. 5 (setting forth relevant common law agency principles). The supervisors acted as the company. *See Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986) ("to say that the 'corporation' has committed some wrong ... simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong"). Liability therefore flows directly to the corporate employer, JSI. *See* Restatement (Second) of Agency § 218 (common law agency principles of ratification); *see also Rosenthal & Co. v. Commodity Futures Trading Comm'n,* 802 F.2d 963, 966 (7th Cir.1986) ("Principals are strictly liable for their agents' acts ... if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized.").

27. Liability also flows to JSI indirectly. JSI may be charged with actual or constructive knowledge of the harassing conduct. "The employee can show that the employer had knowledge of the harassment by proving that she complained to higher management of the problem or by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises." *Huddleston,* 845 F.2d at 904. Both types of knowledge exist in this case.

28. Actual complaints of sexual harassment are documented for several instances. In this regard, two points merit discussion.

(a) One, JSI must assume knowledge for complaints to quartermen and leadermen. As noted *supra,* quartermen and leader-

men are not agents of JSI to the extent that they may be held as employers under Title VII. The facts show, however, that JSI relied upon these quasi-supervisory bargaining unit employees to monitor work performance, particularly on remote job sites within the compounds. Employees perceived that quartermen and leadermen were appropriate persons to whom to complain about work conditions. *Cf. Llewellyn v. Celanese Corp.*, 693 F.Supp. 369, 380 (W.D.N.C.1988) (reporting of incidents of sexual harassment to dispatchers appropriate and adequate notice where dispatchers were in most frequent contact with employee truck drivers and were responsible for passing information up corporate hierarchy to supervisory personnel). Quartermen and leadermen apparently exercised discretion whether to act on these complaints or to refer the complaints to management supervisors. *Cf. id.* JSI structured its work environment in this fashion and condoned the apparent authority sometimes exercised by quartermen and leadermen. Point in fact, the sexual harassment policies were little known and understood, so JSI's formal assignment of complaints to other management personnel was wholly ineffectual. *See Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408 (mere existence of complaint procedure and policy against discrimination insufficient to insulate employer from liability); *cf. EECO v. Hacienda Hotel,* 881 F.2d 1504, 1516 (9th Cir.1989); *Lipsett,* 864 F.2d at 907 n. 27; *Sanchez,* 720 F.Supp. at 979. Accordingly, the company must accept responsibility for the reporting of sexual harassment complaints to the individuals occupying the positions of quartermen and leadermen. Moreover, JSI must bear the responsibility of deterred reports of sexual harassment caused by the treatment of female employees by the quartermen and leadermen.

■ (b) Two, JSI cannot stand on an "ostrich defense" that it lacked knowledge of many of the complaints, because its handling of sexual harassment complaints deterred reporting and it did not conduct adequate investigation of the complaints it did receive. JSI received reports at the supervisory level and at the line level (quartermen and leadermen) concerning incidents of sexual harassment. Additionally, many supervisory personnel admitted that they knew of the sexually-oriented pictures throughout the workplace. Defendants concede several such reports in a series of tables attached to their post-trial brief; the testimony as recorded in the Findings of Fact documents many more reports. These reports should have alerted JSI management to the need to conduct a more thorough investigation of conditions in the shipyards. A duty to conduct further investigation arises when a report or reports of sexual harassment to management suggests that the workplace may be charged in a sexually hostile manner. *See Risinger,* 883 F.2d at 481–83; *Yates v. Avco Corp.,* 819 F.2d 630, 636 (6th Cir.1987); *Paroline,* 879 F.2d at 107; *Rauh v. Coyne,* 744 F.Supp. 1186, 1189 (D.D.C.1990) (investigation of complaints by other female employees may have uncovered problem in workplace prior to harassment of plaintiffs); *Watts v. New York City Police Dep't,* 724 F.Supp. 99, 107–08 & n. 7 (S.D.N.Y.1989) (reports from other female employees may trigger duty to investigate workplace as a whole). JSI instead ignored the warning signs of a hostile work environment. The evidence reveals a supervisory attitude that sexual harassment is an incident-by-incident matter; records were not maintained that would have permitted an analysis of sexual harassment complaints to determine the level of sexual hostility in the workplace. Under these circumstances, the Court concludes that JSI received adequate actual knowledge of the state of the work environment but, like an ostrich, the company elected to bury its head in the sand rather than learn more about the conditions to which female employees, Robinson in particular, were subjected.[10]

**10.** The phrase used here is intended to call attention to the analogy between these circumstances and the concept of deliberate ignorance, covered by the so-called ostrich instruction, in the criminal law. *See, e.g., United States v. Restrepo–Granda,* 575 F.2d 524, 529 (5th Cir.) ("deliberate ignorance is the equivalent of knowledge"), *cert. denied,* 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1978). As one court stated, [w]hen someone knows enough to put him on inquiry, he knows much. If a person with a lurking suspicion goes on as before and

29. The Court additionally imposes constructive knowledge on JSI for the sexually hostile state of its work environment. Constructive knowledge is measured by a practical threshold. An employer escapes liability for isolated and infrequent slurs and misogynist behaviors because even a reasonably prudent employer cannot exercise sufficient control over the workplace to put an end to such conduct; conversely, an employer incurs liability when harassing behavior happens frequently enough that the employer can take steps to halt it. *See Hunter*, 797 F.2d at 1421–22. The sexually harassing behaviors described in the Findings of Fact are too pervasive to have escaped the notice of a reasonably alert management. *E.g., Andrews*, 895 F.2d at 1479, 1486 ("middle management" must have known of comments and pictures); *Waltman*, 875 F.2d at 478–79; *Lipsett*, 864 F.2d at 906 & n. 25 (knowledge unavoidable when management entered areas where pictures were posted); *Bennett*, 845 F.2d at 106 (management official saw offending cartoons but did not remove them until plaintiff complained on next day); *Hall*, 842 F.2d at 1016; *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983). Moreover, the extent to which coworkers and supervisory personnel actually knew of the existence of sexually harassing behavior is a good barometer of the company's constructive knowledge. *Cf. Vaughn v. AG Processing, Inc.*, 459 N.W.2d 627, 635 (Iowa 1990). The testimony before this Court establishes that Robinson's plight was widely known. To the extent that JSI contends that the physical size of its work environment diminished its ability to monitor incidents of sexual harassment, the company must realize that its expansive size may increase its burden in providing a workplace free of discrimination, but that expanse does not decrease its responsibility in this task. *See Llewellyn*, 693 F.Supp. at 380.

30. Given that JSI should have responded and did respond to some aspects of the sexually hostile work environment, the effectiveness of its response must be evaluated. Two methods of measuring effectiveness have received endorsement. One, the employer's total response is evaluated on the basis of the circumstances as then existed. *See, e.g., Brooms*, 881 F.2d at 421. The employer's response is ineffective if "it delay[ed] unduly ... [and] the action it [did] take, however promptly, [was] not reasonably likely to prevent the misconduct from recurring." *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990). Two, an employer can defend successfully by showing that the conduct brought to the company's attention was not repeated after the employer took action. *See, e.g., Steele*, 867 F.2d at 1316 (special importance attached to fact that harassment ended after employer took remedial steps). In this regard, the employer must show the effectiveness of the actions, not merely that actions were taken. *See, e.g., Sanchez*, 720 F.Supp. at 981–82 (remedial action of new sexual harassment policy and procedures constituted change in form, not in substance).

31. JSI did not respond to complaints of sexual harassment with prompt, effective remedial measures. In some instances in which a complaint was made, offending graffiti and pictures were removed promptly; in many other instances, no action was taken or the action was taken after considerable delay. It is noteworthy that the company did not either seek to identify the perpetrators of most harassing incidents (such as the "Men Only" sign and the pictures and graffiti that were removed), *cf. Tunis v. Corning Glass Works*, 698 F.Supp. 452, 460 (S.D.N.Y.1988) (employer could be held liable for failing "to attempt to identify the offending ... employees, much less to discipline them"), *judgment entered for defendant*, 747 F.Supp. 951 (S.D.N.Y.1990), or take steps to communicate with other male employees concerning the nature of the offending behavior and

avoids further knowledge, this may support an inference that he has deduced the truth and is simply trying to avoid giving the appearance (and incurring the consequences) of knowledge.

*United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986).

the need to show respect to female employees, *cf. Daniels v. Essex Group, Inc.*, 740 F.Supp. 553, 556–60 (N.D.Ind.1990) (company did not take steps to warn against repetition of racially harassing behavior). Those remedial actions that were taken, such as the removal of pictures or painting over the "Men Only" sign, lacked effectiveness, as the pictures often were replaced and the sign remained visible through the paint. The evidence shows that complainants were treated as not credible if their complaint lacked independent corroboration, that little investigation was conducted of complaints, and that discipline, on the rare occasions that it was meted out, did not reflect the seriousness of the offense. These weaknesses create liability on the corporation's part. *See, e.g., Paroline*, 879 F.2d at 106–07 (failure to investigate and failure to impose commensurate discipline); *Ways v. City of Lincoln*, 871 F.2d 750, 755 (8th Cir.1989) (failure to investigate and failure to discipline); *Morris*, 730 F.Supp. at 1496–97 (failure to interview complainant and reliance on coworkers to police themselves); *Maturo*, 722 F.Supp. at 923 (failure to intervene after initial complaints); *Anderson v. Hewlett–Packard Corp.*, 694 F.Supp. 1294, 1304 (N.D.Ohio 1988) (demanded additional corroboration from complainants, exhibiting stereotypical thinking about frivolity of complaints by women); *Llewellyn*, 693 F.Supp. at 377–81.

32. Not only were the behaviors repeated throughout the workplace and over time, but examples show that the same individuals would repeat sexually harassing misconduct following intervention from management. Moreover, JSI cannot escape the burden of responsibility for many unreported instances of sexual harassment. Although JSI did not receive the opportunity to respond to these instances due to the lack of a formal complaint, the fact that a complaint was not made resulted from the failure to maintain an effective sexual harassment complaint procedure and other circumstances in the work environment that deterred the reporting of episodes of sexual harassment.

33. The response to Robinson's complaint demonstrated a lack of appreciation for the gravity of the conduct of which she complained. In doing so, management condoned and encouraged further harassment. The small steps taken in response, such as the moving of an offensive calendar and the removal of some pictures, are outweighed by the continuing abuse that went unremedied.

### Executive Order No. 11246

34. Plaintiff asserts that liability may be imposed for violation of the anti-discrimination provisions of Executive Order No. 11246 and as a breach of contract enforced by plaintiff as a third-party beneficiary to the United States Navy contracts entered into by JSI. The Court rejects these theories of liability. In *Banks v. Jacksonville Shipyards, Inc.*, Case No. 88–128–Civ–J–16 (M.D.Fla. July 7, 1988), Judge Moore of this Court dismissed claims asserting these theories of liability. His decision is highly persuasive, for it rests on a sound legal foundation. In *Farkas v. Texas Instruments, Inc.*, 375 F.2d 629, 633 (5th Cir.), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967), the appellate court found no private cause of action under the predecessor order to Executive Order No. 11246. *Farkas* is binding precedent, and its continuing validity received a boost from dictum in *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503, 1515 (11th Cir.1985), that states that no private cause of action is available under Executive Order No. 11246. These cases seem to settle the issue, but if this precedent is not in fact dispositive, the Court adopts the analysis finding no private cause of action which appears in *Utley v. Varian Assocs.*, 811 F.2d 1279, 1284–86 (9th Cir.), *cert. denied*, 484 U.S. 824, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987). *Accord Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750 (D.C.Cir.1990). The third-party beneficiary theory is merely derivative of the private cause of action theory and the former cannot be entertained given the disposition of the latter.

### Remedy

35. Plaintiff is not entitled to monetary relief as a make-whole remedy. As a general rule, a plaintiff is entitled to

backpay when economic injury is suffered as a result of discrimination. *See Nord v. United States Steel Corp.*, 758 F.2d 1462, 1472 (11th Cir.1985) ("Under the 'make whole' rationale ..., victorious Title VII plaintiffs are presumptively entitled to back pay."). Also, a plaintiff's presentation of evidence showing economic injury stemming from discrimination will create an entitlement to backpay unless defendants effectively rebut, by a preponderance of evidence, the plaintiff's assertion of loss. *Id.* at 1470–71. However, the linchpin of these principles is the plaintiff's initial burden to demonstrate economic loss. *See EEOC v. Mike Smith Pontiac GMC, Inc.*, 896 F.2d 524, 529 (11th Cir.1990) (court should not award backpay unless wages are properly owed to employee); *Jinks v. Mays*, 464 F.2d 1223, 1226 (5th Cir.1972) (proving wages are properly owed "requires positive proof that plaintiff was ordinarily entitled to the wages in question and, being without fault, would have received them in the ordinary course of things but for the inequitable conduct of the party from whom the wages are claimed"); *Ross v. Twenty–Four Collection, Inc.*, 681 F.Supp. 1547, 1555 (S.D.Fla. 1988) (employer's burden to rebut claim for backpay begins when plaintiff satisfies "the burden of proving the amount of damage resulting from the employer's discriminatory acts"), *aff'd*, 875 F.2d 873 (11th Cir.1989) (Table). This burden includes the presentation of the evidence of the loss in a form that is not merely speculative. *See, e.g., Huddleston*, 845 F.2d at 905 (evidence of lost commissions too vague to provide basis for award of backpay); *Walker*, 684 F.2d at 1362–63 (backpay properly denied where continued employment was speculative and plaintiff provided no evidence concerning likelihood that he would be retained); *Spencer v. General Elec. Co.*, 697 F.Supp. 204, 219 & n. 19 (E.D.Va.1988) (monetary relief unavailable for speculative

losses of overtime and promotions, particularly given absence of reasonable basis to quantify promotional opportunities), *aff'd*, 894 F.2d 651 (4th Cir.1990); *see also Denton v. Boilermakers Local 29*, 673 F.Supp. 37, 41 (D.Mass.1987) (burden of proving backpay entitlement satisfied by reasonable basis of computation). Robinson has not satisfied this part of her burden, as explained in FOF ¶ 127, and therefore the monetary relief will not be granted.

▇▇▇▇ 36. Nominal damages are available and appropriate where actual loss is not proven or provable. *Huddleston*, 845 F.2d at 905; *Henson*, 682 F.2d at 905; C. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 23 (1935). The Court thus will award nominal damages in the amount of $1.00 against JSI. *See Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978) (one dollar is appropriate amount for nominal damages). Because nominal damages are awarded as a surrogate for a backpay award, the circumstances of an award should be identical. Binding precedent holds that public officials cannot be held personally liable for backpay under Title VII, *see Clanton v. Orleans Parish School Bd.*, 649 F.2d 1084, 1099 & n. 19 (5th Cir. Unit A July 1981); persuasive authority extends this principle to individual employer defendants in private corporations,[11] *see Seib v. Elko Motor Inn, Inc.*, 648 F.Supp. 272, 274 (D.Nev. 1986); *Pree v. Stone & Webster Eng'g Corp.*, 607 F.Supp. 945, 950 (D.Nev.1985). On this basis the nominal damages should be awarded against JSI only. Alternatively, backpay liability also may be limited for equitable reasons tailored to the circumstances of the individual's involvement, *see, e.g., Altman v. Stevens Fashion Fabrics*, 441 F.Supp. 1318, 1321 (N.D.Cal.1977). The circumstances in this case do not show Brown or Stewart to be motivated by any ill will or bad faith; they appear to have

---

11. *Seib* and *Pree* reach this conclusion deductively from *Clanton* and other cases. The same result may be produced from a different approach. Backpay is part of the equitable remedy of reinstatement. *See, e.g., Harkless v. Sweeny Indep. School Dist.*, 427 F.2d 319, 324 (5th Cir.1970), *cert. denied*, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971). It makes little sense

to speak of reinstatement by the individual defendants; the corporate defendant bears the burden of that remedy. Accordingly, since backpay follows from reinstatement, the liability for backpay falls on the shoulder of the employer who reinstates the victim of discrimination, the corporate employer defendant.

acted on their belief concerning the best interests of JSI. The Court thus also finds equitable grounds to limit the assessment of nominal damages to JSI alone.

■ 37. Plaintiff is entitled to injunctive relief. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). It must take the form of negative and affirmative relief. Simply enjoining JSI from engaging in or permitting further sexually harassing behavior is insufficient to repair and rehabilitate the sexually hostile working environment. The history of management's condonation and approval of sexually harassing conditions, together with the past failures to redress effectively those instances of sexual harassment of which management disapproved, argues forcefully for affirmative relief that provides guidance for all employees regarding acceptable and offensive conduct, provides confidence to female employees that their valid complaints of sexual harassment will be remedied, and provides male employees who transgress the boundaries of sexual harassment with notice that their conduct will be penalized commensurate with the seriousness of the offense.

38. This Court must "render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Ms. Wagner endorsed plaintiff's proposed sexual harassment policy and procedures as an effective remedy for the work environment at JSI. The Court agrees with her assessment. The Court notes the use of education, training, and the development of effective complaint procedures as an appropriate remedy in prior hostile work environment sexual harassment cases. *See, e.g., Bundy v. Jackson*, 641 F.2d 934, 947 (D.C.Cir.1981); *Morris*, 730 F.Supp. at 1498; *Sanchez*, 720 F.Supp. at 982; *but see Hopkins v. Price Waterhouse*, 737 F.Supp. 1202, 1216 (D.D.C.1990) (declining to monitor potential for sexual stereotyping in future promotions because remedy is too intrusive, unnecessary to provide notice of potential liability if defendant

failed to monitor itself, and case was atypical), *on remand from* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *aff'd*, 920 F.2d 967 (D.C.Cir.1990). The Court adopts the policy and procedures proposed by plaintiff, with the exceptions stated herein.

■ 39. Injunctive relief is limited to the corporate defendant, JSI, because there exists no reason to believe that Brown and Stewart will act contrary to a court order covering their employer and their liability is incidental to their actions taken within the scope of their employment. They are in privity with JSI and thereby are effectively bound by a decree directed to the corporation alone. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945); *Professional Ass'n of College Educators v. El Paso County Community College Dist.*, 730 F.2d 258, 274 (5th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984); *Texas Util. Co. v. Santa Fe Indus., Inc.*, 553 F.Supp. 106, 111–12 (N.D.Tex. 1982). The narrower coverage relieves the Court of the burden of releasing Brown and Stewart if they should leave JSI or change jobs there.

■ 40. The first amendment guarantee of freedom of speech does not impede the remedy of injunctive relief. *Accord Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 350 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989); *Jew v. University of Iowa*, 749 F.Supp. 946, 961 (S.D.Iowa 1990); *cf. EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 (11th Cir.1990) (upholding injunction directed to racially abusive language in workplace, without addressing free speech issues).

(a) First, JSI has disavowed that it seeks to express itself through the sexually-oriented pictures or the verbal harassment by its employees. No first amendment concern arises when the employer has no intention to express itself, *see Sage Realty*, 507 F.Supp. at 610 & n. 17, and JSI's action in limiting the speech options of its employees in the workplace, *see* FOF ¶¶ 20–21, establishes that the company may direct an

end to the posting of materials without abridging its employees' free speech rights, *cf. May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105, 1110 (7th Cir.1986) (because "workplace is for working," employer may lawfully withhold its consent for employees to engage in expressive activities).

(b) Second, the pictures and verbal harassment are not protected speech because they act as discriminatory conduct in the form of a hostile work environment. *See Roberts v. United States Jaycees*, 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984) ("[P]otentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection."); *Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984); Strauss, *Sexist Speech in the Workplace*, 25 HARV.C.R.–C.L.L.REV. 1, 38–41 (1990). In this respect, the speech at issue is indistinguishable from the speech that comprises a crime, such as threats of violence or blackmail, of which there can be no doubt of the authority of a state to punish. *E.g., Rankin v. McPherson*, 483 U.S. 378, 386–87, 107 S.Ct. 2891, 2897–99, 97 L.Ed.2d 315 (1987) (threat to kill the President is not protected by first amendment); *United States v. Shoulberg*, 895 F.2d 882, 886 (2d Cir.1990) (threats to intimidate witnesses); *see generally* Greenawalt, *Criminal Coercion and Freedom of Speech*, 78 NW.U.L.REV. 1081 (1983); Greenawalt, *Speech and Crime*, 1980 AM.B. FOUND.RES.J. 645. This treatment is consistent with the holding of *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), that a ban on discriminatory help-wanted advertisements did not offend the first amendment. *See also* Smolla, *Rethinking First Amendment Assumptions About Racist and Sexist Speech*, 47 WASH. & LEE L.REV. 171, 197 (1990) (transactional setting of sexual harassment opens sexist speech to regulation); *cf. Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir.) (casual chit-chat while working is not protected speech), *cert. denied*, —— U.S. ——, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990).

(c) Third, the regulation of discriminatory speech in the workplace constitutes nothing more than a time, place, and manner regulation of speech. *See* Strauss, *supra*, at 46 ("[B]anning sexist speech in the workplace does not censor such speech everywhere and for all time."). The standard for this type of regulation requires a legitimate governmental interest unrelated to the suppression of speech, content neutrality, and a tailoring of the means to accomplish this interest. *See, e.g., United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). The eradication of workplace discrimination is more than simply a legitimate governmental interest, it is a compelling governmental interest. *See Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987) (eliminating discrimination against women is compelling governmental interest); *Roberts*, 468 U.S. at 626, 104 S.Ct. at 3254 (compelling governmental interest lies in removing barriers to economic advancement and political and social integration that have historically plagued women). Given the circumstances of the JSI work environment, the method of regulation set forth in this order narrowly tailors the regulation to the minimum necessary to remedy the discrimination problem. To the extent that the regulation here does not seem entirely content neutral, the distinction based on the sexually explicit nature of the pictures and other speech does not offend constitutional principles. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48–49, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986); *see also* Sunstein, *Pornography and the First Amendment*, 1986 DUKE L.J. 589, 616–17.

(d) Fourth, female workers at JSI are a captive audience in relation to the speech that comprises the hostile work environment. "Few audiences are more captive than the average worker.... Certainly, if employer-employee relations involve sufficient coercion that we justify regulation in other contexts, then this coercion does not suddenly vanish when the issue is submission to racist or sexist speech." Balkin, *Some Realism About Pluralism: Legal*

*Realist Approaches to the First Amendment,* 1990 DUKE L.J. 375, 423–24. The free speech guarantee admits great latitude in protecting captive audiences from offensive speech. *See, e.g., Frisby v. Schultz,* 487 U.S. 474, 487, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988); *FCC v. Pacifica Found.,* 438 U.S. 726, 744–51, 98 S.Ct. 3026, 3037–41, 57 L.Ed.2d 1073 (1978) (plurality opinion); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 302–04, 94 S.Ct. 2714, 2716–18, 41 L.Ed.2d 770 (1974) (plurality opinion).

(e) Fifth, if the speech at issue is treated as fully protected, and the Court must balance the governmental interest in cleansing the workplace of impediments to the equality of women, the latter is a compelling interest that permits the regulation of the former and the regulation is narrowly drawn to serve this interest. *Cf. United States v. Paradise,* 480 U.S. 149, 171–85, 107 S.Ct. 1053, 1066–74, 94 L.Ed.2d 203 (1987) (performing similar analysis for race-conscious remedy to race discrimination). Other first amendment rights, such as the freedom of association and the free exercise of religion, have bowed to narrowly tailored remedies designed to advance the compelling governmental interest in eradicating employment discrimination. *See, e.g., Rotary Int'l,* 481 U.S. at 548–49, 107 S.Ct. at 1947–48; *EEOC v. Pacific Press,* 676 F.2d 1272, 1280–81 (9th Cir. 1982); *EEOC v. Mississippi College,* 626 F.2d 477, 488–89 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *see also Ellis v. Brotherhood of Ry. Airline & S.S. Clerks,* 466 U.S. 435, 455–56, 104 S.Ct. 1883, 1895–96, 80 L.Ed.2d 428 (1984) (governmental interest in industrial peace justifies interference with dissenting employees first amendment rights resulting from allowing union shop).

(f) Sixth, the public employee speech cases lend a supportive analogy. If this Court's decree is conceptualized as a governmental directive concerning workplace rules that an employer must carry out, then the present inquiry is informed by the limits of a governmental employer's power to enforce workplace rules impinging on free speech rights. In the public employee speech cases, the interests of the employee in commenting on protected matters is balanced against the employer's interests in maintaining discipline and order in the workplace. *See, e.g., Finch v. City of Vernon,* 877 F.2d 1497, 1502 (11th Cir.1989). When an employee's exercise of free expression undermines the morale of the workforce, the employer may discipline or discharge the employee without violating the first amendment. *See, e.g., Bryson v. City of Waycross,* 888 F.2d 1562, 1564–67 (11th Cir.1989). Analogously, the Court may, without violating the first amendment, require that a private employer curtail the free expression in the workplace of some employees in order to remedy the demonstrated harm inflicted on other employees. *Cf. McMullen v. Carson,* 568 F.Supp. 937, 943–45 (M.D.Fla.1983) (finding no first amendment violation in discharge of KKK member from police force because *inter alia* internal discipline and morale were threatened by potential for racial confrontations), *aff'd,* 754 F.2d 936 (11th Cir. 1985); *accord Rankin,* 483 U.S. at 391 n. 18, 107 S.Ct. at 2901 n. 18.

(g) Finally, defendants' reliance upon *American Booksellers Ass'n v. Hudnut,* 771 F.2d 323 (7th Cir.1985), *sum. aff'd,* 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986), is misplaced. Two concerns dominate that case. One is the broad definition of "pornography" in the Indianapolis ordinance. *See* 771 F.2d at 332. This issue is not present in this case because the affected speech, if it is speech protected by the first amendment, is reached only after a determination that a harm has been and is continuing to be inflicted on identifiable individuals. The second concern raised in *Hudnut* is the underlying proposition of the Indianapolis ordinance that pornography conveys a message that is always inappropriate and always subject to punishment, regardless of the context in which it appears. *See id.* at 327–32. In this case, the context of the speech is the heart of the cause of action and the remedy goes no further than to regulate the time, place, and manner of the offensive speech. *Cf. Bryson,* 888 F.2d at 1567 (public employee may be discharged lawfully for uttering

on-job speech which would be protected fully if uttered off-duty and in private).

41. The National Labor Relations Act does not impede the grant of injunctive relief to require a policy and procedures to handle sexual harassment complaints. The Court does not perceive that the obligations imposed by the policy and procedures are inconsistent with the collective bargaining agreement between JSI and Local 805 of the International Brotherhood of Boilermakers. *See* Nowlin, *Sexual Harassment in the Workplace: How Arbitrators Rule,* 43 ARB.J. 31, 35 (Dec. 1988) (arbitrators generally sustain discipline arising from sexually harassing behavior of the type experienced at JSI); *see also Newsday, Inc. v. Long Island Typographical Union, No. 915,* 915 F.2d 840, 843–45 (2d Cir.1990) (vacating arbitrator's award reinstating sexual harasser because arbitrator disregarded public policy against sexual harassment in workplace). The unilateral institution of sexual harassment policies by JSI in 1980 and 1987 suggests that the company does not view this area as one subject to bargaining. Defendants' argument regarding the failure to join the union as a party is not well-taken. Joinder of the union in a discrimination suit is not necessary where the relief does not compel revision of the collective bargaining agreement, but only affects the application of its neutral terms to individuals. *See Karan v. Nabisco, Inc.,* 78 F.R.D. 388, 401–02 (W.D.Pa.1978); *accord Forsberg v. Pacific N.W. Bell Tel. Co.,* 622 F.Supp. 1147, 1150, *granting reconsideration to* 623 F.Supp. 117 (D.Ore. 1985), *aff'd on other grounds,* 840 F.2d 1409, 1420 (9th Cir.1988) (appellate court expressly declined to rule on joinder issue); *Hutcheson v. Tennessee Valley Auth.,* 604 F.Supp. 543, 548–49 (M.D.Tenn.1985). Plaintiff alleged no wrongdoing by the union and she seeks, at most, only to clarify the application of the nondiscrimination and just cause clauses within the collective bargaining agreement. Under these circumstances, JSI's apparent concern about conflicting obligations placed the onus on it to join the union as a party. An employer may be required to grant relief to victims of discrimination that conflicts with expectations otherwise created by a collective bargaining agreement. *See Franks v. Bowman Transp. Co.,* 424 U.S. 747, 774–79, 96 S.Ct. 1251, 1268–71, 47 L.Ed.2d 444 (1976); *EEOC v. McCall Printing Corp.,* 633 F.2d 1232, 1237 (6th Cir.1980). To the extent that the employer incurs conflicting obligations due to its compliance with a decree to remedy past discrimination, the burden of reconciling the conflict falls on the employer, not the victims of discrimination. *See W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766–70, 103 S.Ct. 2177, 2183–86, 76 L.Ed.2d 298 (1983); *see also Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 2187, 104 L.Ed.2d 835 (1989).

42. The right of unionized employees to representation during some investigatory interviews, based in § 7 of the NLRA, *see NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 256–64, 95 S.Ct. 959, 963–67, 43 L.Ed.2d 171 (1975), does limit the procedures that the Court may order. The proposal submitted by plaintiff and adopted by the Court, however, does not impose any restriction on the right to representation during investigations. The requirement of confidentiality where possible does not exclude the lawful role of the union in representation of its members. The policy and procedures should be implemented in a fashion that does not abridge *Weingarten* rights.

43. Based on the foregoing, the Court will affirmatively enjoin defendant JSI to adopt, implement, and enforce a policy and procedures for the prevention and control of sexual harassment, substantially in the form proposed by plaintiff. The Court will set forth in this order its modifications of the proposed policy and procedures. In addition, JSI will have thirty (30) days in which to submit any specific objections that relate to its ability to implement and enforce the policy and procedures, as modified. The Court grants this time for the limited purpose of raising issues in the practical execution of its mandate; the objections should not concern the substance of it. Moreover, the Court expects that the parties will confer about any potential objections that JSI will lodge and that they will work in good faith to craft a solution to the legitimate concerns that JSI may

identify. It is the opinion of the Court that, at this stage of the proceedings, JSI does not waive or otherwise prejudice any objections previously raised to the proposed remedy by working with plaintiff to shape a workable remedy. The judgment in this case is not final until such time as the Court rules on any objections that JSI submits or JSI informs the Court that it has no objections, either by the passage of the allotted time or by formal notice filed with the Court.

44. The scope of the policy and procedures to be adopted by JSI is as follows.

(a) Plaintiff's proposed Sexual Harassment and Retaliation Policy (Exhibit A to Appendix II of plaintiff's Pretrial Brief) shall be adopted by JSI in full. The policy shall receive the widest form of distribution, including publication in the company's work rules book, posting throughout the shops, and distribution to the workers directly, as explained in plaintiff's proposed Sexual Harassment and Retaliation Procedures and Rules for Education and Training (Exhibit E to Appendix II of plaintiff's Pretrial Brief).[12]

(b) JSI shall adopt an equivalent to plaintiff's proposed Sexual Harassment and Retaliation—Statement of Prohibited Conduct (Exhibit B to Appendix II of plaintiff's Pretrial Brief) and likewise ensure wide distribution. JSI need not adopt word-for-word plaintiff's proposal, but the statement must cover the same subjects, with the exception of the second-to-last paragraph regarding conduct away from work,[13] and must be calculated to communicate clearly the prohibitions to JSI employees.

(c) JSI shall adopt an equivalent to plaintiff's proposed Sexual Harassment and Retaliation—Schedule of Penalties for Misconduct (Exhibit C to Appendix II of plaintiff's

Pretrial Brief). The schedule shall reflect the seriousness of sexually harassing behavior, but JSI may integrate the levels of discipline and progression thereof to match its treatment of other serious workplace misconduct.

(d) Plaintiff's proposed Procedures for Making, Investigating and Resolving Sexual Harassment and Retaliation Complaints (Exhibit D to Appendix II of plaintiff's Pretrial Brief) provides a model that JSI shall adopt except for the provision requiring an Independent Investigator. The Court does not preclude JSI from voluntarily undertaking to employ an Independent Investigator; this modification is intended solely to lift that aspect of the proposal as a requirement. The Court is not persuaded that the sexual harassment reporting system needs a permanent outside monitor to guarantee its performance or instill employee confidence. The Court will require, however, that plaintiff's counsel or a representative of the Court shall be given reasonable access to inspect for compliance.

(e) Plaintiff's proposed Sexual Harassment and Retaliation Procedures and Rules for Education and Training (Exhibit E to Appendix II of plaintiff's Pretrial Brief) has four distinctive parts. The Court will require JSI to adopt only the first part, concerning education and training.

(f) JSI shall provide the Court with its equivalent to the Statement of Prohibited Conduct and the Schedule of Penalties no later than thirty (30) days from the entry of this order. JSI may elect to adopt the plaintiff's proposals in lieu of its own by filing a notice with the Court stating as much.

45. In Title VII actions, prevailing plaintiffs may recover reasonable

---

**12.** The Court recognizes that the versions of Exhibit B and Exhibit E attached to plaintiff's proposed findings of fact and conclusions of law differ in some small ways from the versions included with the pretrial brief. Regarding Exhibit B, the differences are truly minor and not of consequence because JSI is charged with adopting an equivalent, not a word-for-word copy. Regarding Exhibit E, the relevant differences involve the identification of McIlwain by name in the later-filed version, whereas the version from which the Court operates identifies

the Chief Executive Officer/President as an office. The version used by the Court is preferable because McIlwain is not personally liable and no longer holds the relevant office.

**13.** The Court has ruled that this type of conduct is outside the issues in this case and therefore it is inappropriate to include it in the relief ordered herein. JSI is not barred from voluntarily inserting similar language in its statement or developing a separate policy statement on the matter.

attorney fees as a part of costs. 42 U.S.C. § 2000e–5(k). Absent special circumstances, the court should award reasonable attorney fees. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978). No such circumstances exist in this case; accordingly, plaintiff is entitled to recover her costs and attorney fees in this action. Because this type of award follows the award of nominal damages, *see Huddleston,* 845 F.2d at 905; *Henson,* 682 F.2d at 905, it is assessed only against JSI. The application for attorney fees should address the factors for evaluating the reasonableness of a request developed in *Norman v. Housing Authority,* 836 F.2d 1292 (11th Cir. 1988), and *Perkins v. Mobile Housing Board,* 847 F.2d 735 (11th Cir.1988). Because some of plaintiff's counsel is affiliated with an out-of-town public interest litigation group, attention also should be directed to Judge Thomas' opinion in *Dunn v. The Florida Bar,* 726 F.Supp. 1261, 1279–80 (M.D.Fla.1988), *aff'd on other grounds,* 889 F.2d 1010 (11th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990).

In accordance with the foregoing, it is hereby

ADJUDGED:

That judgment shall be entered in favor of plaintiff Lois Robinson and against defendants Jacksonville Shipyards, Inc., Lawrence Brown, and John Stewart on the claim made pursuant to Title VII of the Civil Rights Act of 1964;

That this action shall be dismissed as to defendant John Kiedrowski;

That judgment shall be entered in favor of defendants Arnold McIlwain, Elmer L. Ahlwardt, Everette P. Owens, and Ellis Lovett and against plaintiff on the claim made pursuant to Title VII of the Civil Rights Act of 1964;

That judgment shall be entered in favor of all defendants and against plaintiff on the claim made pursuant to Executive Order No. 11246;

That injunctive relief shall be issued against defendant Jacksonville Shipyards, Inc. in the form described in the Conclusions of Law;

That nominal damages shall be assessed against defendant Jacksonville Shipyards, Inc.;

That plaintiff shall be awarded her reasonable costs and attorney fees from defendant Jacksonville Shipyards, Inc.; and

That a separate order will be entered regarding the foregoing matters.

DONE AND ORDERED.

### ORDER, INJUNCTION AND FINAL JUDGMENT

This cause is before the Court for the entry of final judgment and an injunction in accordance with the Court's Findings of Fact and Conclusions of Law, entered herein on January 18, 1991. In an Order entered that same day, the Court offered an opportunity to defendant, Jacksonville Shipyards, Inc. ("JSI"), to register objections to plaintiff's proposed policy and procedures. JSI filed its objections herein on February 26, 1991. Plaintiff replied in a letter dated February 28, 1991, which the Court accepted for filing herein on March 1, 1991.[1]

Plaintiff raises an issue whether some of JSI's objections are within the scope of the Court's grant. As the Findings of Fact and Conclusions of Law, at 94 (para. 34), state, the Court gave JSI time

in which to submit any specific objections that relate to its ability to implement and enforce the policy and procedures, as modified. The Court grants this time for the limited purpose of raising issues in the practical execution of its mandate; the objections should not concern the substance of it.

Plaintiff objects that JSI has raised objections going to the substance of the Court's mandate.

The Court agrees. A review of JSI's objections reveals that the following of

---

**1.** Counsel should be cognizant of the strictures of Local Rule 3.01(f), which disapprove of the

use of letters to present arguments to the Court.

them are beyond the leave of the Court and therefore should be stricken: I(B), I(D), I(E), I(F), II(A), II(B), III(C), III(D), IV(A), IV(B), IV(C), IV(D), IV(F), and IV(G). Also, JSI's gratuitous inclusion of a letter allegedly written by two of its female employees is an unauthorized supplement to the record; it will be stricken. By the same token, the second paragraph of the letter from plaintiff's counsel, in response to the letter attached by JSI, adds without permission to a record that is closed; it will be stricken.

JSI makes a request in its objections for a hearing. This case was tried over the course of several days and JSI had the option to introduce evidence on a remedy. It did not. The opportunity to object that this Court provided was an extraordinary exercise of discretion in order to secure input that could enhance the workability of the injunction. The Court finds no need to hold a hearing to gain further input.

Objection I(A) proposes that the Statement of Prohibited Conduct is too open-ended if sexual comments or jokes are prohibited when a person has "indicated" that they are objectionable rather than an express advance statement of disapproval. Were the work environment at JSI pristine, this argument might merit consideration. *But the very purpose of this injunction is to remedy a hostile work environment.* As such, "breathing room" for the victims of that environment must be created. The objection is overruled.

Objection I(C) relays JSI's concern that "as a practical matter JSI cannot prohibit displays or possession of materials on ships by employees, such as ship crew members." The Court understands that JSI may lack the legal authority to direct the removal of materials on ships, but this does not exhaust JSI's avenues for controlling the work environment. Consistent with its obligations under the policy and procedures, JSI shall take such steps that are within its power to control the work environment aboard ships, including consultation with ship owners about the removal or covering of pictures posted aboard ships and storage of materials belonging to crew members, during repairs.

Objection II(C) recommends flexibility in the discipline of management personnel. Plaintiff concedes this objection is "laudable" if properly communicated to workers. The substance of the objection has been incorporated into the injunction. However, JSI should remain cognizant of its obligation to exercise its "flexibility" consistent with its duty to stop unlawful conduct. *See Ellison v. Brady,* 924 F.2d 872, 875–76 (9th Cir.1991).

Objection III(A) speaks to the access of complainants to the files on sexual harassment complaints. Plaintiff expresses her concern that JSI's language does not achieve her goal that complainants know from the start of the process how long disposition of the complaint will take. In the Court's view, the two issues are distinct. JSI's objection is valid and plaintiff's concern is valid. Requests by complainants to see files will receive response within a reasonable time. Moreover, although the injunction does not contain plaintiff's language, it is entered under the contemplation that the Investigative Officers will give each complainant an estimate of the expected length of the investigation. While the estimate is not binding, the ability to meet it, together with the reasons for any failure to meet it, will be properly considered in assessing JSI's good faith in implementing the injunction.

Objection III(B) states that "[r]equiring posting of the Policy in 'convenient' locations calls for an opinion judgment." While this is true, the good faith decision by JSI to determine "convenient" locations can hardly be assailed. In case of doubt, JSI may consult with plaintiff or her counsel.

Objections III(E) and III(F) have been considered and incorporated into the Court's injunction.

Objection III(G) is well-founded. Plaintiff urges that the language she proposed is designed to secure access to all interviews of alleged harassers and witnesses and to notes of such interviews. The Court is of the opinion that the guarantee to complainants of access to the investigation

file adequately covers this issue, and should be construed as such.

Objection IV(E) raises the salient point that plaintiff's proposal included training on racial harassment when that issue is not present in this case. This is a sex discrimination case and the remedy cannot exceed the scope of the cause of action.

While the Court will strike Objections IV(B) and IV(C), plaintiff indicates a willingness to address reductions in JSI's costs for training if the effectiveness of the training can be maintained. The Court leaves it to the parties to negotiate any such changes and experiment accordingly; the injunction should not be read to bar any *agreed* alterations in the training program designed to reduce its cost or enhance its effectiveness.

In accordance with the Findings of Fact and Conclusions of Law and the foregoing, it is

ORDERED AND ADJUDGED:

1. That the Court hereby strikes defendant's objections I(B), I(D), I(E), I(F), II(A), II(B), III(C), III(D), IV(A), IV(B), IV(D), IV(F), IV(G), Attachment 2 to the objections, and the second paragraph of plaintiff's letter memorandum;

2. That defendant Jacksonville Shipyards, Inc., is hereby enjoined to cease and desist from the maintenance of a work environment that is hostile to women because of their sex and to remedy the hostile work environment through the implementation, forthwith, of the Sexual Harassment Policy, which consists of the "Statement of Policy," "Statement of Prohibited Conduct," "Schedule of Penalties for Misconduct," "Procedures for Making, Investigating and Resolving Sexual Harassment and Retaliation Complaints," and "Procedures and Rules for Education and Training," attached as an appendix hereto and incorporated by reference; and

3. That final judgment is hereby entered as follows:

(a) dismissing defendant John Kiedrowski from this action;

(b) in favor of all remaining defendants and against plaintiff on the claim made pursuant to Executive Order No. 11246;

(c) in favor of defendants Arnold McIlwain, Elmer L. Ahlwardt, Everette P. Owens, and Ellis Lovett and against plaintiff on the claim made pursuant to Title VII of the Civil Rights Act of 1964;

(d) in favor of plaintiff and against defendants Lawrence Brown and John Stewart on the issue of liability for the Title VII claim, without an award of damages or other relief; and

(e) in favor of plaintiff and against defendant Jacksonville Shipyards, Inc., on the Title VII claim, for nominal damages in the amount of one dollar ($1.00), for costs and attorney fees in an amount to be determined, and for injunctive relief in the form described in the previous section of this Order.

DONE AND ORDERED.

## APPENDIX

### JACKSONVILLE SHIPYARDS, INC. SEXUAL HARASSMENT POLICY

#### STATEMENT OF POLICY

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, sex, age or national origin. *Sexual harassment is included among the prohibitions.*

Sexual harassment, according to the federal Equal Employment Opportunity Commission (EEOC), consists of unwelcome sexual advances, requests for sexual favors or other verbal or physical acts of a sexual or sex-based nature where (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) an employment decision is based on an individual's acceptance or rejection of such conduct; or (3) such conduct interferes with an individual's work performance or creates an intimidating, hostile or offensive working environment.

It is also unlawful to retaliate or take reprisal in any way against anyone who

has articulated any concern about sexual harassment or discrimination, whether that concern relates to harassment of or discrimination against the individual raising the concern or against another individual.

Examples of conduct that would be considered sexual harassment or related retaliation are set forth in the Statement of Prohibited Conduct which follows. These examples are provided to illustrate the kind of conduct proscribed by this Policy; the list is not exhaustive.

Jacksonville Shipyards, Inc., and its agents are under a duty to investigate and eradicate any form of sexual harassment or sex discrimination or retaliation. To further that end, JSI has issued a procedure for making complaints about conduct in violation of this Policy and a schedule for violation of this Policy.

Sexual harassment is unlawful, and such prohibited conduct exposes not only JSI, but individuals involved in such conduct, to significant liability under the law. Employees at all times should treat other employees respectfully and with dignity in a manner so as not to offend the sensibilities of a co-worker. Accordingly, JSI's management is committed to vigorously enforcing its Sexual Harassment Policy at all levels within the Company.

## STATEMENT OF
## PROHIBITED CONDUCT

The management of Jacksonville Shipyards, Inc., considers the following conduct to represent some of the types of acts which violate JSI's Sexual Harassment Policy:

A. *Physical assaults of a sexual nature, such as:*

(1) rape, sexual battery, molestation or attempts to commit these assaults; and

(2) intentional physical conduct which is sexual in nature, such as touching, pinching, patting, grabbing, brushing against another employee's body, or poking another employee's body.

B. *Unwanted sexual advances, propositions or other sexual comments, such as:*

(1) sexually-oriented gestures, noises, remarks, jokes, or comments about a person's sexuality or sexual experience directed at or made in the presence of any employee who indicates or has indicated in any way that such conduct in his or her presence is unwelcome;

(2) preferential treatment or promise of preferential treatment to an employee for submitting to sexual conduct, including soliciting or attempting to solicit any employee to engage in sexual activity for compensation or reward; and

(3) subjecting, or threats of subjecting, an employee to unwelcome sexual attention or conduct or intentionally making performance of the employee's job more difficult because of that employee's sex.

C. *Sexual or discriminatory displays or publications anywhere in JSI's workplace by JSI employees, such as:*

(1) displaying pictures, posters, calendars, graffiti, objects, promotional materials, reading materials, or other materials that are sexually suggestive, sexually demeaning, or pornographic, or bringing into the JSI work environment or possessing any such material to read, display or view at work.

A picture will be presumed to be sexually suggestive if it depicts a person of either sex who is not fully clothed or in clothes that are not suited to or ordinarily accepted for the accomplishment of routine work in and around the shipyard and who is posed for the obvious purpose of displaying or drawing attention to private portions of his or her body.

(2) reading or otherwise publicizing in the work environment materials that are in any way sexually revealing, sexually suggestive, sexually demeaning or pornographic; and

(3) displaying signs or other materials purporting to segregate an employee by sex in any area of the workplace (other than restrooms and similar semi-private lockers/changing rooms).

D. *Retaliation for sexual harassment complaints, such as:*

(1) disciplining, changing work assignments of, providing inaccurate work information to, or refusing to cooperate or discuss work-related matters with any employee because that employee has complained about or resisted harassment, discrimination or retaliation; and

(2) intentionally pressuring, falsely denying, lying about or otherwise covering up or attempting to cover up conduct such as that described in any item above.

E. *Other acts:*

(1) The above is not to be construed as an all inclusive list of prohibited acts under this policy.

(2) Sexual harassment is unlawful and hurts other employees. Any of the prohibited conduct described here is sexual harassment of anyone at whom it is directed or who is otherwise subjected to it. Each incident of harassment, moreover, contributes to a general atmosphere in which all persons who share the victim's sex suffer the consequences. Sexually-oriented acts or sex-based conduct have no legitimate business purpose; accordingly, the employee who engages in such conduct should be and will be made to bear the full responsibility for such unlawful conduct.

## SCHEDULE OF PENALTIES FOR MISCONDUCT

The following schedule of penalties applies to all violations of the JSI Sexual Harassment Policy, as explained in more detail in the Statement of Prohibited Conduct.

Where progressive discipline is provided for, each instance of conduct violating the Policy moves the offending employee through the steps of disciplinary action. In other words, it is not necessary for an employee to repeat the same precise conduct in order to move up the scale of discipline.

A written record of each action taken pursuant to the Policy will be placed in the offending employee's personnel file. The record will reflect the conduct, or alleged conduct, and the warning given, or other discipline imposed.

(A) *Assault*

Any employee's first proven offense of assault or threat of assault, including assault of a sexual nature, will result in dismissal.

(B) *Other acts of harassment by co-workers*

An employee's commission of acts of sexual harassment other than assault will result in non-disciplinary oral counseling upon alleged first offense, written warning, suspension or discharge upon the first proven offense, depending upon the nature and severity of the misconduct, and suspension or discharge upon the second proven offense, depending on the nature and severity of the misconduct.

(C) *Retaliation*

Alleged retaliation against a sexual harassment complainant will result in non-disciplinary oral counseling. Any form of proven retaliation will result in suspension or discharge upon the first proven offense, depending upon the nature and severity of the retaliatory acts, and discharge upon the second proven offense.

(D) *Supervisors*

A supervisor's commission of acts of sexual harassment (other than assault) with respect to any other employee under that person's supervision will result in non-disciplinary oral counseling upon alleged first offense, final warning or dismissal

for the first offense, depending upon the nature and severity of the misconduct, and discharge for any subsequent offense.

## PROCEDURES FOR MAKING, INVESTIGATING AND RESOLVING SEXUAL HARASSMENT AND RETALIATION COMPLAINTS

### A. *Complaints*

JSI will provide its employees with convenient, confidential and reliable mechanisms for reporting incidents of sexual harassment and retaliation. Accordingly, JSI designates at least two employees in supervisory or managerial positions at each of the Commercial and Mayport Yards to serve as Investigative Officers for sexual harassment issues. The names, responsibilities, work locations, and phone numbers of each Officer will be routinely and continuously posted so that an employee seeking such name can enjoy anonymity and remain inconspicuous to all of the employees in the yard in which he or she works.

The Investigative Officers may appoint "designees" to assist them in handling sexual harassment complaints. Persons appointed as designees shall not conduct investigation until they have received training equivalent to that received by the Investigative Officers. The purpose of having several persons to whom complaints may be made is to avoid a situation where an employee is faced with complaining to the person, or a close associate of the person, who would be the subject of the complaint.

Complaints of acts of sexual harassment or retaliation that are in violation of the sexual harassment policy will be accepted in writing or orally, and anonymous complaints will be taken seriously and investigated. Anyone who has observed sexual harassment or retaliation should report it to a designated Investigative Officer. A complaint need not be limited to someone who was the target of harassment or retaliation.

Only those who have an immediate need to know, including the Investigative Officers and/or his/her designee, the alleged target of harassment or retaliation, the alleged harasser(s) or retaliator(s) and any witnesses will or may find out the identity of the complainant. All parties contacted in the course of an investigation will be advised that all parties involved in a charge are entitled to respect and that any retaliation or reprisal against an individual who is an alleged target of harassment or retaliation, who has made a complaint or who has provided evidence in connection with a complaint is a separate actionable offense as provided in the schedule of penalties. This complaint process will be administered consistent with federal labor law when bargaining unit members are affected.

### B. *Investigations*

Each Investigative Officer will receive thorough training about sexual harassment and the procedures herein and will have the responsibility for investigating complaints or having an appropriately trained and designated JSI investigator do so.

All complaints will be investigated expeditiously by a trained JSI Investigative Officer or his/her designee. The Investigative Officer will produce a written report, which, together with the investigation file, will be shown to the complainant upon request within a reasonable time. The Investigative Officer is empowered to recommend remedial measures based upon the results of the investigation, and JSI management will promptly consider and act upon such recommendation. When a complaint is made the Investigative Officer will have the duty of immediately bringing all sexual harassment and retaliation complaints to the confidential attention of the office of the President of JSI, and JSI's EEO Officer. The Investigative and EEO Officers will each maintain a file on the original charge and follow up investigation. Such files will be available to investigators, to federal, state and local agencies charged with equal employment or affirmative action en-

forcement, to other complainants who have filed a formal charge of discrimination against JSI, or any agent thereof, whether that formal charge is filed at a federal, state, or local law level. The names of complainants, however, will be kept under separate file.

### C. *Cooperation*

An effective sexual harassment policy requires the support and example of company personnel in positions of authority. JSI agents or employees who engage in sexual harassment or retaliation or who fail to cooperate with company-sponsored investigations of sexual harassment or retaliation may be severely sanctioned by suspension or dismissal. By the same token, officials who refuse to implement remedial measures, obstruct the remedial efforts of other JSI employees, and/or retaliate against sexual harassment complainants or witnesses may be immediately sanctioned by suspension or dismissal.

### D. *Monitoring*

Because JSI is under legal obligations imposed by Court order, the NOW Legal Defense and Education Fund, its designated representative, and, if one is appointed upon motion and a showing of need, a representative of the U.S. District Court for the Middle District of Florida are authorized to monitor the JSI workplace, even in the absence of specific complaints, to ensure that the company's policy against sexual harassment is being enforced. Such persons are not ordinarily to be used in lieu of the JSI Investigative Officers on investigations of individual matters, but instead are to be available to assess the adequacy of investigations. Any individual dissatisfied with JSI's investigation of a complaint may contact such persons in writing or by telephone and request an independent investigation. Such persons' addresses and telephone numbers will be posted and circulated with those of the Investigative Officers. Such persons will be given reasonable access by JSI to inspect for compliance.

### PROCEDURES AND RULES FOR EDUCATION AND TRAINING

Education and training for employees at each level of the work force are critical to the success of JSI's policy against sexual harassment. The following documents address such issues: the letter to be sent to all employees from JSI's Chief Executive Officer/President, the Sexual Harassment policy, Statement of Prohibited Conduct, the Schedule of Penalties for Misconduct, and Procedures for Making, Investigating and Resolving Sexual Harassment and Retaliation Complaints. These documents will be conspicuously posted throughout the workplace at each division of JSI, on each company bulletin board, in all central gathering areas, and in every locker room. The statements must be clearly legible and displayed continuously. The sexual harassment policy under a cover letter from JSI's president will be sent to all employees. The letter will indicate that copies are available at no cost and how they can be obtained.

JSI's sexual harassment policy statement will also be included in the Safety Instructions and General Company Rules, which are issued in booklet form to each JSI employee. Educational posters using concise messages conveying JSI's opposition to workplace sexual harassment will reinforce the company's policy statement; these posters should be simple, eye-catching and graffiti resistant.

Education and training include the following components:

1. *For all JSI employees:* As part of general orientation each recently hired employee will be given a copy of the letter from JSI's Chief Executive Officer/President and requested to read and sign a receipt for the company's policy statement on sexual harassment so that they are on notice of the standards of behavior expected. In addition, supervisory employees who have attended a management training seminar on sexual harassment will explain orally at least once every six months at safety meetings attended by all em-

ployees the kinds of acts that constitute sexual harassment, the company's serious commitment to eliminating sexual harassment in the workplace, the penalties for engaging in harassment, and the procedures for reporting incidents of sexual harassment.

2. *For all female employees:* All women employed at JSI will participate on company time in annual seminars that teach strategies for resisting and preventing sexual harassment. At least a half-day in length, these seminars will be conducted by one or more experienced sexual harassment educators, including one instructor with work experience in the trades.

3. *For all employees with supervisory authority over other employees, including leadermen, quartermen, superintendents, and all employees working in a managerial capacity:* All supervisory personnel will participate in an annual, half-day-long training session on sex discrimination. At least one-third of each session (of no less than one and one-half hours) will be devoted to education about workplace sexual harassment, including training (with demonstrative evidence) as to exactly what types of remarks, behavior and pictures will not be tolerated in the JSI workplace. The president of JSI will attend the training sessions in one central location with all company supervisory employees. The president will introduce the seminar with remarks stressing the potential liability of JSI and individual supervisors for sexual harassment and the need to eliminate harassment. Each participant will be informed that they are responsible for knowing the contents of JSI's sexual harassment policy and for giving similar presentations at safety meetings to employees.

4. *For all Investigative Officers:* The Investigative Officers and their designees, if any, will attend annual full-day training seminars conducted by experienced sexual harassment educators and/or investigators to educate them about the problems of sexual harassment in the workplace and techniques for investigating and stopping it.

The training sessions for components 2–4 will be conducted by an experienced sexual harassment educator chosen jointly by JSI and the NOW Legal Defense and Education Fund after receiving bids. In the event of a disagreement between the parties, the parties will refer the matter to an arbitrator chosen by the parties.